FRANKLIN, SECRETARY OF COMMERCE, ET AL. *v.*
MASSACHUSETTS ET AL.

No. 91–1502.   Argued April 21, 1992—Decided June 26, 1992

O'CONNOR, J., announced the judgment of the Court and delivered the opinion of the Court with respect to Parts I and II, in which REHNQUIST, C. J., and WHITE, SCALIA, and THOMAS, JJ., joined, the opinion of the Court with respect to Part IV, in which REHNQUIST, C. J., and WHITE, BLACKMUN, STEVENS, KENNEDY, SOUTER, and THOMAS, JJ., joined, and an opinion with respect to Part III, in which REHNQUIST, C. J., and WHITE

and THOMAS, JJ., joined. STEVENS, J., filed an opinion concurring in part and concurring in the judgment, in which BLACKMUN, KENNEDY, and SOUTER, JJ., joined, *post*, p. 807. SCALIA, J., filed an opinion concurring in part and concurring in the judgment, *post*, p. 823.

*Deputy Solicitor General Roberts* argued the cause for appellants. With him on the briefs were *Solicitor General Starr, Assistant Attorney General Gerson, Edwin S. Kneedler, Michael Jay Singer,* and *Mark B. Stern.*

*Dwight Golann,* Assistant Attorney General of Massachusetts, argued the cause for appellees. With him on the briefs were *Scott Harshbarger,* Attorney General, *Steve Berenson,* Assistant Attorney General, and *John P. Driscoll, Jr., Edward P. Leibensperger,* and *Neil P. Motenko,* Special Assistant Attorneys General.*

JUSTICE O'CONNOR delivered the opinion of the Court, except as to Part III.

As one season follows another, the decennial census has again generated a number of reapportionment controversies. This decade, as a result of the 1990 census and reapportionment, Massachusetts lost a seat in the House of Representatives. Appellees Massachusetts and two of its registered voters brought this action against the President, the Secretary of Commerce (Secretary), Census Bureau officials, and the Clerk of the House of Representatives, challenging, among other things, the method used for counting federal employees serving overseas. In particular, the appellants' allocation of 922,819 overseas military personnel to the State

---

*Robert Abrams,* Attorney General of New York, *Jerry Boone,* Solicitor General, and *Sanford M. Cohen,* Assistant Attorney General, *Daniel E. Lungren,* Attorney General of California, *Thomas D. Barr,* and *Robert S. Rifkind* filed a brief for the State of New York et al. as *amici curiae* urging affirmance.

*Kenneth O. Eikenberry,* Attorney General of Washington, *James M. Johnson,* Senior Assistant Attorney General, and *J. Lawrence Coniff* filed a brief for the State of Washington as *amicus curiae.*

designated in their personnel files as their "home of record" altered the relative state populations enough to shift a Representative from Massachusetts to Washington. A three-judge panel of the United States District Court for the District of Massachusetts held that the decision to allocate military personnel serving overseas to their "homes of record" was arbitrary and capricious under the standards of the Administrative Procedure Act (APA), 5 U. S. C. § 701 et seq. As a remedy, the District Court directed the Secretary to eliminate the overseas federal employees from the apportionment counts, directed the President to recalculate the number of Representatives per State and transmit the new calculation to Congress, and directed the Clerk of the House of Representatives to inform the States of the change. The federal officials appealed. We noted probable jurisdiction, stayed the District Court's order, and ordered expedited briefing and argument. 503 U. S. 442 (1992). We now reverse.

I

Article I, § 2, cl. 3, of the Constitution provides that Representatives "shall be apportioned among the several States . . . according to their respective Numbers," which requires, by virtue of § 2 of the Fourteenth Amendment, "counting the whole number of persons in each State." The number of persons in each State is to be calculated by "actual Enumeration," conducted every 10 years, "in such Manner as [Congress] shall by Law direct." U. S. Const., Art. I, § 2, cl. 3.

The delegates to the Constitutional Convention included the periodic census requirement in order to ensure that entrenched interests in Congress did not stall or thwart needed reapportionment. See 1 M. Farrand, Records of the Federal Convention of 1787, pp. 571, 578–588 (rev. ed. 1966). Their effort was only partially successful, as the congressional battles over the method for calculating the reapportionment still caused delays. After just such a 10-year stalemate after the 1920 census, Congress reformed the reapportionment proc-

ess to make it virtually self-executing, so that the number of Representatives per State would be determined by the Secretary of Commerce and the President without any action by Congress. See S. Rep. No. 2, 71st Cong., 1st Sess., 2–3 (1929) ("The need for legislation of this type is confessed by the record of the past nine years during which Congress has refused to translate the 1920 census into a new apportionment. . . . As a result, great American constituencies have been robbed of their rightful share of representation . . ."); *Department of Commerce* v. *Montana*, 503 U. S. 442, 451–452, and n. 25 (1992).

Under the automatic reapportionment statute, the Secretary of Commerce takes the census "in such form and content as [s]he may determine." 13 U. S. C. § 141(a). The Secretary is permitted to delegate her authority for establishing census procedures to the Bureau of the Census. See §§ 2, 4. "The tabulation of total population by States . . . as required for the apportionment of Representatives in Congress . . . shall be completed within 9 months after the census date and reported by the Secretary to the President of the United States." § 141(b). After receiving the Secretary's report, the President "shall transmit to the Congress a statement showing the whole number of persons in each State . . . as ascertained under the . . . decennial census of the population, and the number of Representatives to which each State would be entitled under an apportionment of the then existing number of Representatives by the method known as the method of equal proportions . . . ." 2 U. S. C. § 2a(a). "Each State shall be entitled . . . to the number of Representatives shown" in the President's statement, and the Clerk of the House of Representatives must "send to the executive of each State a certificate of the number of Representatives to which such State is entitled." § 2a(b).

With the one-time exception in 1900 of counting overseas servicemen at their family home, the Census Bureau did not allocate federal personnel stationed overseas to particular

States for reapportionment purposes until 1970. App. 175, 177. The 1970 census, taken during the Vietnam War, allocated members of the Armed Forces stationed overseas to their "home of record," using Defense Department personnel records. *Id.*, at 179. "Home of record" is the State declared by the person upon entry into military service, and determines where he or she will be moved after military service is complete. *Id.*, at 149. Because the Bureau found that military personnel were likely to designate a "home of record" with low or no income taxes instead of their true home State—even though home of record does not determine state taxation—the Bureau did not allocate overseas employees to particular States in the 1980 census. App. 180.

Initially, the Bureau took the position that overseas federal employees would not be included in the 1990 state enumerations either. There were, however, stirrings in Congress in favor of including overseas federal employees, especially overseas military, in the state population counts. Several bills requiring the Secretary to include overseas military were introduced but not passed in the 100th and 101st Congresses. See H. R. 3814, 100th Cong., 1st Sess. (1987); H. R. 4234, 100th Cong., 2d Sess. (1988); H. R. 3815, 100th Cong., 1st Sess. (1987); H. R. 4720, 100th Cong., 2d Sess. (1988); S. 2103, 100th Cong., 2d Sess. (1988); H. R. 1468, 101st Cong., 1st Sess. (1989); H. R. 2661, 101st Cong., 1st Sess. (1989); H. R. 3016, 101st Cong., 1st Sess. (1989); S. 290, 101st Cong., 1st Sess. (1989). In July 1989, nine months before the census taking was to begin, then-Secretary of Commerce Robert Mosbacher agreed to allocate overseas federal employees to their home States for purposes of congressional apportionment. App. 182. His decision memorandum cites both the growing congressional support for including overseas employees and the Department of Defense's belief that "its employees should not be excluded from apportionment counts because of temporary and involuntary residence overseas." *Id.*, at 120. Another factor explaining the Secre-

tary's shift was that the Department of Defense, the largest federal overseas employer, planned to poll its employees to determine, among other things, which State they considered their permanent home. *Id.*, at 184. In December 1989, however, the Defense Department canceled its plans to conduct the survey due to a lack of funds. *Ibid.* As an alternative, the Defense Department suggested that it could provide data on its employees' last six months of residence in the United States, information that would be more complete and up-to-date than the home of record data already in the personnel files. This possibility also failed to materialize when the Defense Department informed the Census Bureau that it was not able to assemble the information after all. *Ibid.*

In the meantime, two more bills were introduced in Congress, but not passed, which would have required the Census Bureau to apportion members of the overseas military to their home States using the "home of record" data already in their personnel files. See H. R. 4903, 101st Cong., 2d Sess. (1990); S. 2675, 101st Cong., 2d Sess. (1990). In July 1990, six months before the census count was due to be reported to the President, the Census Bureau decided to allocate the Department of Defense's overseas employees to the States based on their "home of record." App. 185. It chose the home of record designation over other data available, including legal residence and last duty station, because home of record most closely resembled the Census Bureau's standard measure of state affiliation—"usual residence." 3 Record 925. Legal residence was thought less accurate because the choice of legal residence may have been affected by state taxation. Indeed, the Congressional Research Service found that in 1990 "the nine States with either no income taxes, or those which tax only interest and dividend income, have approximately 9 percent more of the overseas military personnel claiming the States for tax purposes, than those same States receive using *home of record*." Congressional

Research Service Report, App. 151, n. 13. For similar reasons, last duty station was rejected because it would provide only a work address, and the employee's last home address might have been in a different State, as with those, for example, who worked in the District of Columbia but lived in Virginia or Maryland. 3 Record 925. Residence at a "last duty station" may also have been of a very short duration and may not have reflected the more enduring tie of usual residence. App. 150. Those military personnel for whom home of record information was not available were allocated based on legal residence or last duty station, in that order. *Id.*, at 186.

The Census Bureau invited 40 other federal agencies with overseas employees to submit counts of their employees as well. Of those, only 30 actually submitted counts, and only 20 agencies included dependents in their enumeration. Four of the agencies could not provide a home State for all of their overseas employees. *Ibid.*

Appellees challenged the decision to allocate federal overseas employees, and the method used to do so, as inconsistent with the APA and with the constitutional requirement that the apportionment of Representatives be determined by an "actual Enumeration" of persons "in each State." U. S. Const., Art. I, § 2, cl. 3; U. S. Const., Amdt. 14, § 2. Appellees focused their attack on the Secretary's decision to use "home of record" data for military personnel. The District Court, finding that it had jurisdiction to address the merits of the claims, was "skeptical" of the merits of appellees' constitutional claims, speculating that "[t]here would appear to be nothing inherently unconstitutional in a properly supported decision to include overseas federal employees in apportionment counts." *Commonwealth* v. *Mosbacher*, 785 F. Supp. 230, 266 (Mass. 1992). The District Court nonetheless held that, on the administrative record before it, the Secretary's decision to allocate the employees and to use home

of record data was arbitrary and capricious under the standards of the APA. *Id.,* at 264–266.

## II

Appellees raise claims under both the APA and the Constitution. We address first the statutory basis for our jurisdiction under the APA. See *Blum* v. *Bacon,* 457 U. S. 132, 137 (1982); *Burton* v. *United States,* 196 U. S. 283, 295 (1905).

The APA sets forth the procedures by which federal agencies are accountable to the public and their actions subject to review by the courts. The Secretary's report to the President is an unusual candidate for "agency action" within the meaning of the APA, because it is not promulgated to the public in the Federal Register, no official administrative record is generated, and its effect on reapportionment is felt only after the President makes the necessary calculations and reports the result to the Congress. Contrast 2 U. S. C. § 441a(e) (requiring Secretary to publish each year in the Federal Register an estimate of the voting age population). Only after the President reports to Congress do the States have an entitlement to a particular number of Representatives. See § 2a(b) ("Each State shall be entitled . . . to the number of Representatives shown in the [President's] statement").

The APA provides for judicial review of "final agency action for which there is no other adequate remedy in a court." 5 U. S. C. § 704. At issue in this case is whether the "final" action that appellees have challenged is that of an "agency" such that the federal courts may exercise their powers of review under the APA. We hold that the final action complained of is that of the President, and the President is not an agency within the meaning of the Act. Accordingly, there is no final agency action that may be reviewed under the APA standards.

To determine when an agency action is final, we have looked to, among other things, whether its impact "is suffi-

ciently direct and immediate" and has a "direct effect on . . . day-to-day business." *Abbott Laboratories* v. *Gardner*, 387 U. S. 136, 152 (1967). An agency action is not final if it is only "the ruling of a subordinate official," or "tentative." *Id.*, at 151. The core question is whether the agency has completed its decisionmaking process, and whether the result of that process is one that will directly affect the parties. In this case, the action that creates an entitlement to a particular number of Representatives and has a direct effect on the reapportionment is the President's statement to Congress, not the Secretary's report to the President.

Unlike other statutes that expressly require the President to transmit an agency's report directly to Congress, § 2a does not. Compare, *e. g.*, 20 U. S. C. § 1017(d) ("The President shall transmit each such report [of the National Advisory Council on Continuing Education] to the Congress with his comments and recommendations"); 30 U. S. C. § 1315(c) (similar language); 42 U. S. C. § 3015(f) (similar language); 42 U. S. C. § 6633(b)(2) (similar language). After receiving the Secretary's report, the President is to "transmit to the Congress a statement showing the whole number of persons in each State . . . as ascertained under the . . . decennial census of the population." 2 U. S. C. § 2a(a). Section 2a does not expressly require the President to use the data in the Secretary's report, but, rather, the data from the "decennial census." There is no statute forbidding amendment of the "decennial census" itself after the Secretary submits the report to the President. For potential litigants, therefore, the "decennial census" still presents a moving target, even after the Secretary reports to the President. In this case, the Department of Commerce, in its press release issued the day the Secretary submitted the report to the President, was explicit that the data presented to the President was still subject to correction. See United States Department of Commerce News, Bureau of Census, 1990 Census Population for the United States is 249,632,692: Reapportionment Will

Shift 19 Seats in the U. S. House of Representatives 2 (Dec. 26, 1990) ("The population counts set forth herein are subject to possible correction for undercount and overcount. The United States Department of Commerce is considering whether to correct these counts and will publish corrected counts, if any, not later than July 15, 1991").[1] Moreover, there is no statute that rules out an instruction by the President to the Secretary to reform the census, even after the data are submitted to him. It is not until the President submits the information to Congress that the target stops moving, because only then are the States entitled by § 2a to a particular number of Representatives. Because the Secretary's report to the President carries no direct consequences for the reapportionment, it serves more like a tentative recommendation than a final and binding determination. It is, like "the ruling of a subordinate official," *Abbott Laboratories* v. *Gardner, supra,* at 151, not final and therefore not subject to review. Cf. *Chicago & Southern Air Lines, Inc.* v. *Waterman S. S. Corp.,* 333 U. S. 103, 109 (1948); *United States* v. *George S. Bush & Co.,* 310 U. S. 371, 379 (1940).

The statutory structure in this case differs from that at issue in *Japan Whaling Assn.* v. *American Cetacean Soc.,* 478 U. S. 221 (1986), in which we held that the Secretary of Commerce's certification to the President that another country was endangering fisheries was "final agency action." *Id.,* at 231, n. 4. In that case, the Secretary's certification

---

[1] JUSTICE STEVENS suggests that the "decennial census" is a single count, determined solely by the Secretary, that is used for many purposes other than reapportionment of Representatives. Therefore, he reasons, it cannot be within the control of the President. However, the President may be involved in the policymaking tasks of his Cabinet members, whether or not his involvement is explicitly required by statute. The question here is whether the census count is final before the President acts. It seems clear that it is not. The tabulations used for purposes of state redistricting, which include counts of persons in each state district, are not required by statute to be completed until April 1, months after the President's report to Congress. 13 U. S. C. § 141(c).

to the President under 22 U. S. C. § 1978(a)(1) automatically triggered sanctions by the Secretary of State under 16 U. S. C. § 1821(e)(2)(B), regardless of any discretionary action the President himself decided to take. *Japan Whaling, supra,* at 226. Under 13 U. S. C. § 141(a), by contrast, the Secretary's report to the President has no direct effect on reapportionment until the President takes affirmative steps to calculate and transmit the apportionment to Congress.

Appellees claim that because the President exercises no discretion in calculating the numbers of Representatives, his "role in the statutory scheme was intended to have no substantive content," and the final action is the Secretary's, not the President's. Brief for Appellees 86. They cite the Senate Report for the bill that became 2 U. S. C. § 2a, which states that the President is to report "upon a problem in mathematics which is standard, and for which rigid specifications are provided by Congress itself, and to which there can be but one mathematical answer." S. Rep. No. 2, 71st Cong., 1st Sess., at 4–5.

The admittedly ministerial nature of the apportionment calculation itself does not answer the question whether the apportionment is foreordained by the time the Secretary gives her report to the President. To reiterate, § 2a does not curtail the President's authority to direct the Secretary in making policy judgments that result in "the decennial census"; he is not expressly required to adhere to the policy decisions reflected in the Secretary's report. Because it is the President's personal transmittal of the report to Congress that settles the apportionment, until he acts there is no determinate agency action to challenge. The President, not the Secretary, takes the final action that affects the States.

Indeed, it is clear that Congress thought it was important to involve a constitutional officer in the apportionment process. Congress originally considered a bill requiring the Secretary to report the apportionment calculation directly

to Congress. See S. Rep. No. 1446, 70th Cong., 2d Sess., 4 (1929). The bill was later amended to require the participation of the President: "Another objection to the previous bill was that the Secretary of Commerce should not be intrusted with the final responsibility for making so important a report to Congress. The new and pending bill recognizes this objection to the extent that the President is substituted for the Secretary of Commerce so that this function may be served by a constitutional officer. This makes for greater permanence, which is one of the major virtues to be desired in such a statute." S. Rep. No. 2, *supra*, at 5. It is hard to imagine a purpose for involving the President if he is to be prevented from exercising his accustomed supervisory powers over his executive officers. Certainly no purpose to alter the President's usual superintendent role is evident from the text of the statute.

As enacted, 2 U. S. C. § 2a provides that the Secretary cannot act alone; she must send her results to the President, who makes the calculations and sends the final apportionment to Congress. That the final act is that of the President is important to the integrity of the process and bolsters our conclusion that his duties are not merely ceremonial or ministerial. Thus, we can only review the APA claims here if the President, not the Secretary of Commerce, is an "agency" within the meaning of the Act.

The APA defines "agency" as "each authority of the Government of the United States, whether or not it is within or subject to review by another agency, but does not include— (A) the Congress; (B) the courts of the United States; (C) the governments of the territories or possessions of the United States; (D) the government of the District of Columbia." 5 U. S. C. §§ 701(b)(1), 551(1). The President is not explicitly excluded from the APA's purview, but he is not explicitly included, either. Out of respect for the separation of powers and the unique constitutional position of the President, we find that textual silence is not enough to subject the Presi-

dent to the provisions of the APA. We would require an express statement by Congress before assuming it intended the President's performance of his statutory duties to be reviewed for abuse of discretion. Cf. *Nixon* v. *Fitzgerald,* 457 U. S. 731, 748, n. 27 (1982) (Court would require an explicit statement by Congress before assuming Congress had created a damages action against the President). As the APA does not expressly allow review of the President's actions, we must presume that his actions are not subject to its requirements. Although the President's actions may still be reviewed for constitutionality, see *Youngstown Sheet & Tube Co.* v. *Sawyer,* 343 U. S. 579 (1952); *Panama Refining Co.* v. *Ryan,* 293 U. S. 388 (1935), we hold that they are not reviewable for abuse of discretion under the APA, see *Armstrong* v. *Bush,* 288 U. S. App. D. C. 38, 45, 924 F. 2d 282, 289 (1991). The District Court erred in proceeding to determine the merits of the APA claims.

## III

Although the reapportionment determination is not subject to review under the standards of the APA, that does not dispose of appellees' constitutional claims. See *Webster* v. *Doe,* 486 U. S. 592, 603–605 (1988). Constitutional challenges to apportionment are justiciable. See *Department of Commerce* v. *Montana,* 503 U. S. 442 (1992).

We first address standing.[2] To invoke the constitutional power of the federal courts to adjudicate a case or controversy under Article III, appellees here must allege and prove an injury "fairly traceable to the [appellants'] allegedly unlawful conduct and likely to be redressed by the requested relief." *Allen* v. *Wright,* 468 U. S. 737, 751 (1984).

---

[2] While appellants asserted below that the courts have no subject-matter jurisdiction over this case because it involves a "political question," we recently rejected a similar argument in *Department of Commerce* v. *Montana,* 503 U. S., at 456–459, and appellants now concede the issue. Brief for Appellants 21.

To determine whether appellees sufficiently allege and prove causation requires separating out. appellees' claims: Appellees claim both that the Secretary erred in deciding to allocate overseas employees to various States and that the Secretary erred in using inaccurate data to do so. Appellees have shown that Massachusetts would have had an additional Representative if overseas employees had not been allocated at all. App. 183. They have neither alleged nor shown, however, that Massachusetts would have had an additional Representative if the allocation had been done using some other source of "more accurate" data. Consequently, even if appellees have standing to challenge the Secretary's decision to allocate, they do not have standing to challenge the accuracy of the data used in making that allocation. We need, then, review only the decision to include overseas federal employees in the state population counts, not the Secretary's choice of information sources.

The thornier standing question is whether the injury is redressable by the relief sought. Tracking the statutory progress of the census data from the Census Bureau, through the President, and to the States, the District Court entered an injunction against the Secretary of Commerce, the President, and the Clerk of the House. 785 F. Supp., at 268. While injunctive relief against executive officials like the Secretary of Commerce is within the courts' power, see *Youngstown Sheet & Tube Co.* v. *Sawyer, supra,* the District Court's grant of injunctive relief against the President himself is extraordinary, and should have raised judicial eyebrows. We have left open the question whether the President might be subject to a judicial injunction requiring the performance of a purely "ministerial" duty, *Mississippi* v. *Johnson,* 4 Wall. 475, 498–499 (1867), and we have held that the President may be subject to a subpoena to provide information relevant to an ongoing criminal prosecution, *United States* v. *Nixon,* 418 U. S. 683 (1974), but in general "this

court has no jurisdiction of a bill to enjoin the President in the performance of his official duties." *Mississippi* v. *Johnson, supra,* at 501. At the threshold, the District Court should have evaluated whether injunctive relief against the President was available, and, if not, whether appellees' injuries were nonetheless redressable.

For purposes of establishing standing, however, we need not decide whether injunctive relief against the President was appropriate, because we conclude that the injury alleged is likely to be redressed by declaratory relief against the Secretary alone. See *Duke Power Co.* v. *Carolina Environmental Study Group, Inc.,* 438 U. S. 59, 75, n. 20 (1978); *Allen* v. *Wright, supra,* at 752. The Secretary certainly has an interest in defending her policy determinations concerning the census; even though she cannot herself change the reapportionment, she has an interest in litigating its accuracy. And, as the Solicitor General has not contended to the contrary, we may assume it is substantially likely that the President and other executive and congressional officials would abide by an authoritative interpretation of the census statute and constitutional provision by the District Court, even though they would not be directly bound by such a determination.

## IV

On the merits, appellees argue that the Secretary's allocation of overseas federal employees to the States violated the command of Article I, § 2, cl. 3, that the number of Representatives per State be determined by an "actual Enumeration" of "their respective Numbers," that is, a count of the persons "in" each State. Appellees point out that the first census conducted in 1790 required that persons be allocated to their place of "usual residence." Brief for Appellees 77. See Act of Mar. 1, 1790, § 5, 1 Stat. 103. Because the interpretations of the Constitution by the First Congress are per-

suasive, *Bowsher* v. *Synar*, 478 U. S. 714, 723–724 (1986), appellees argue that the Secretary should have allocated the overseas employees to their overseas stations, because those were their usual residences.

The appellants respond, on the other hand, that the allocation of employees temporarily stationed overseas to their home States is fully compatible with the standard of "usual residence" used in the early censuses. We review the dispute to the extent of determining whether the Secretary's interpretation is consistent with the constitutional language and the constitutional goal of equal representation. See *Department of Commerce* v. *Montana*, 503 U. S., at 459.

"Usual residence" was the gloss given the constitutional phrase "in each State" by the first enumeration Act and has been used by the Census Bureau ever since to allocate persons to their home States. App. 173–174. The term can mean more than mere physical presence, and has been used broadly enough to include some element of allegiance or enduring tie to a place. The first enumeration Act itself provided that "every person occasionally absent at the time of the enumeration [shall be counted] as belonging to that place in which he usually resides in the United States." Act of Mar. 1, 1790, §5, 1 Stat. 103. The Act placed no limit on the duration of the absence, which, considering the modes of transportation available at the time, may have been quite lengthy. For example, during the 36-week enumeration period of the 1790 census, President George Washington spent 16 weeks traveling through the States, 15 weeks at the seat of Government, and only 10 weeks at his home in Mount Vernon. He was, however, counted as a resident of Virginia. T. Clemence, Place of Abode, reproduced in App. 83.

The first enumeration Act uses other words as well to describe the required tie to the State: "usual place of abode," "inhabitant," "usual reside[nt]." Act of Mar. 1, 1790, §5, 1 Stat. 103. The first draft of Article I, §2, also used the word "inhabitant," which was omitted by the Committee of Style

in the final provision. 2 Farrand, Records of the Federal Convention of 1787, at 566, 590.[3]

In the related context of congressional residence qualifications, U. S. Const., Art. I, § 2, James Madison interpreted the constitutional term "inhabitant" to include "persons absent occasionally for a considerable time on public or private business." 2 Farrand, Records of the Federal Convention of 1787, at 217. This understanding was applied in 1824, when a question was raised about the residency qualifications of would-be Representative John Forsyth, of Georgia. Mr. Forsyth had been living in Spain during his election, serving as minister plenipotentiary from the United States. His qualification for office was challenged on the ground that he was not "an inhabitant of the State in which he [was] chosen." U. S. Const., Art. I, § 2, cl. 2. The House Committee of Elections disagreed, reporting: "There is nothing in Mr. Forsyth's case which disqualifies him from holding a seat in this House. The capacity in which he acted, excludes the idea that, by the performance of his duty abroad, he ceased to be an inhabitant of the United States; and, if so, inasmuch as he had no inhabitancy in any other part of the Union than Georgia, he must be considered as in the same situation as before the acceptance of the appointment." M. Clarke & D. Hall, Cases of Contested Elections in Congress 497–498 (1834). Representative Bailey, supporting the qualification of Mr. Forsyth, pointed out that if "the mere living in a place constituted inhabitancy," it would "exclude sitting members of this House." Id., at 497 (emphasis deleted).

Up to the present day, "usual residence" has continued to hold broad connotations. For example, up until 1950, college

---

[3] As submitted to the Committee of Style, the provision read: "[T]he Legislature shall . . . regulate the number of representatives by the number of inhabitants." 2 M. Farrand, Records of the Federal Convention of 1787, p. 566 (rev. ed. 1966). After its return by the Committee, it had a more familiar ring: "Representatives . . . shall be apportioned among the several states . . . according to their respective numbers." Id., at 590.

students were counted as belonging to the State where their parents resided, not to the State where they attended school. App. 219. Even today, high school students away at boarding school are allocated to their parents' home State, not the location of the school. *Id.*, at 220. Members of Congress may choose whether to be counted in the Washington, D. C., area or in their home States. *Id.*, at 218. Those persons who are institutionalized in out-of-state hospitals or jails for short terms are also counted in their home States. *Id.*, at 225.

In this case, the Secretary of Commerce made a judgment, consonant with, though not dictated by, the text and history of the Constitution, that many federal employees temporarily stationed overseas had retained their ties to the States and could and should be counted toward their States' representation in Congress: "Many, if not most, of these military overseas consider themselves to be usual residents of the United States, even though they are temporarily assigned overseas." *Id.*, at 120. The Secretary's judgment does not hamper the underlying constitutional goal of equal representation, but, assuming that employees temporarily stationed abroad have indeed retained their ties to their home States, actually promotes equality. If some persons sharing in Washington's fate had not been properly counted, the votes of all those who reside in Washington State would not have been weighted equally to votes of those who reside in other States. Certainly, appellees have not demonstrated that eliminating overseas employees entirely from the state counts will make representation in Congress more equal. Cf. *Karcher* v. *Daggett*, 462 U. S. 725, 730–731 (1983) (parties challenging state apportionment legislation bear burden of proving disparate representation). We conclude that appellees' constitutional challenge fails on the merits.

The District Court's judgment is

*Reversed.*

JUSTICE STEVENS, with whom JUSTICE BLACKMUN, JUSTICE KENNEDY, and JUSTICE SOUTER join, concurring in part and concurring in the judgment.

In my opinion the census report prepared by the Secretary of Commerce is "final agency action" subject to judicial review under the Administrative Procedure Act (APA), 5 U. S. C. § 701 *et seq.* I am persuaded, however, that the Secretary complied with the Census Act and with the Constitution in the preparation of the 1990 census and that, under the standard of deference appropriate here, the Secretary's actions were not arbitrary or capricious. I therefore agree that the judgment of the District Court must be reversed.

I

During the decade after 1980 the population of Massachusetts increased less rapidly than the population of the entire Nation. In the apportionment following the 1990 census, it received only 10 of the 435 seats in the House of Representatives whereas formerly it had 11.

In the District Court, appellees, who are the Commonwealth of Massachusetts and two of its registered voters, made two separate attacks on the process that reduced the size of Massachusetts' congressional delegation. They challenged the Secretary's conduct of the census, and they challenged the method of apportioning congressional seats based on the census report. The District Court rejected the challenge to the constitutionality of the method of apportionment prescribed in the Apportionment Act of 1941, 55 Stat. 761–762. *Commonwealth* v. *Mosbacher*, 785 F. Supp. 230, 256 (Mass. 1992). That decision was consistent with the analysis subsequently set forth in our opinion in *Department of Commerce* v. *Montana*, 503 U. S. 442 (1992), and is no longer in dispute. Pursuant to the judicial review provisions of the APA, 5 U. S. C. § 706(2), the District Court also examined the decision of the Secretary of Commerce to include overseas federal employees in the census count. The

court concluded that the Secretary's decision was "arbitrary and capricious, and an abuse of discretion." 785 F. Supp., at 267.

In a rather surprising development, this Court reverses because it concludes that the census report is not "final agency action," 5 U. S. C. § 704. The reason the Court gives for this conclusion is that the President—who is not himself a part of the agency that prepared the census and who has no statutory responsibilities under the Census Act—might revise that report in some way when he is performing his responsibilities under an entirely separate statute, the Apportionment Act. The logic of the Court's opinion escapes me, and apparently was not obvious to the Solicitor General, for he advanced no such novel claim in his argument seeking reversal. The Court's conclusion is erroneous for several reasons.

## II

Article I, § 2, cl. 3, of the Constitution, as modified by the Fourteenth Amendment, provides that Members of the House of Representatives "shall be apportioned among the several States according to their respective numbers, counting the whole number of persons in each State . . . ." To ensure that the apportionment remains representative of the current population, the Constitution further requires that a census be taken at least every 10 years.[1]

Beginning in 1790, Congress fulfilled the constitutional command by passing a Census Act every 10 years. Under the early census statutes, marshals would transmit the collected information to the Secretary of State. The census functions of the Secretary of State were transferred to the Secretary of the Interior after that Department was estab-

---

[1] "The actual Enumeration shall be made within three Years after the first Meeting of the Congress of the United States, and within every subsequent Term of ten Years, in such manner as they shall by Law direct." U. S. Const., Art. I, § 2, cl. 3.

lished in 1849.[2]  A Census Office in the Department of the Interior was established in 1899 and made permanent in 1902.[3]  A year later, the Census Office was moved to the newly formed Department of Commerce and Labor.[4]

Following each census, Congress enacted a statute to reapportion the House of Representatives.  After the 1920 census, however, Congress failed to pass a reapportionment Act. This congressional deadlock provided the impetus for the 1929 Act that established a self-executing apportionment in the case of congressional inaction.  See S. Rep. No. 2, 71st Cong., 1st Sess., 2–4 (1929).  The bill produced an automatic reapportionment through the application of a mathematical formula to the census.  The automatic connection between the census and the reapportionment was the key innovation of the Act.[5]

In its original version, the bill directed the Secretary of Commerce to apply a mathematical formula to the census figures and to transmit the resulting apportionment calculations to Congress.  A later version made the President responsible for performing the mathematical computations and reporting the result.  From the legislative history, it is clear that this change in the designated official was intended to have no substantive significance.[6]  There is no indication

---

[2] See C. Wright, The History and Growth of the United States Census, S. Doc. No. 194, 56th Cong., 1st Sess., 40 (1900).

[3] 32 Stat. 51.

[4] 32 Stat. 826–827.

[5] See 71 Cong. Rec. 1609–1610 (1929) (remarks of Sen. Vandenberg). The automatic reapportionment on the basis of the decennial census was retained when the reapportionment features of the bill were modified somewhat in 1941.  Act of Nov. 15, 1941, 55 Stat. 761.  See *Department of Commerce* v. *Montana*, 503 U. S. 442, 451–452, and n. 25 (1992).

[6] The sponsor of the bill, Senator Vandenberg, explained the change: "[T]he President of the United States is substituted in the bill as the person who shall make the computation and report instead of the Secretary of Commerce, who was identified in the bill last February simply and solely because it was my own personal notion that if we were to accomplish a permanent end through the passage of permanent legislation it were

whatsoever of an intention to introduce a layer of Executive discretion between the taking of the census and the application of the reapportionment formula. The intention was exactly the contrary: to make the apportionment proceed automatically based on the census.

The statutory scheme creates an interlocking set of responsibilities for the Secretary and the President. The Secretary of Commerce is required to take a "decennial census of population as of the first day of April of [every tenth] year, which date shall be known as the 'decennial census date.'" 13 U. S. C. § 141(a). The Secretary reports the collected information to the President, see § 141(b), who is directed to "transmit to the Congress" a statement showing the population of each State "as ascertained under the seventeenth and each subsequent decennial census . . . ." 2 U. S. C. § 2a(a). The plain language of the statute demonstrates that the President has no substantive role in the computation of the census. The Secretary takes the "decennial census," and the President performs the apportionment calculations and transmits the census figures and apportionment results to Congress.

In the face of this clear statutory mandate, the Court must fall back on an argument based on statutory silence. The Court insists that there is no law *prohibiting* the President from changing the census figures after he receives them from the Secretary. The Court asserts: "Section 2a does not expressly require the President to use the data in the *Secretary's report*, but, rather, the data from the *'decennial census.'*" *Ante*, at 797 (emphasis added). This statement is difficult to comprehend, for it purports to contrast two terms that the statute equates. The "decennial census" is the name the statute gives to the information collected by the

better to name a constitutional officer rather than a statutory officer. I have quite no pride of opinion at that point and I think it makes quite no difference, because everybody will get the same answer when we undertake to do that problem in arithmetic." 71 Cong. Rec. 1613 (1929).

Secretary and reported to the President. The Court's argument cannot be harmonized with a statutory scheme that directs the Secretary to take the "decennial census" and the President to report to Congress figures "as ascertained under the . . . decennial census." This language cannot support the Court's view that the statute endows the President with discretion to modify the census results reported by the Secretary.

The legislative record, moreover, establishes that the Executive involvement in the process is to be wholly ministerial.[7] The question of the discretion allowed to the President was discussed on the floor of the Senate, and the sponsor of the bill, Senator Vandenberg of Michigan, stated unequivocally that the President exercised no discretion whatsoever: "I believe as a matter of indisputable fact, that function served by the President is as purely and completely a ministerial function as any function on earth could be." 71 Cong. Rec. 1858 (1929).[8] In a colloquy with other legisla-

---

[7] The Senate Report, for example, states:

"The objection that this is an improper 'delegation of power' to the Department of Commerce (which takes the census) and to the President (who reports the arithmetic) is answered by an examination of the facts. No power whatever is delegated. The Department of Commerce counts the people (as it always has done) and the President reports upon a problem in mathematics which is standard, and for which rigid specifications are provided by Congress itself, and to which there can be but one mathematical answer." S. Rep. No. 2, 71st Cong., 1st Sess., 4–5 (1929).

[8] At another point, Senator Vandenberg explained:

"The bill calls upon the President to report the result of a census to the Congress. We have always depended upon somebody to report the result of a census to us. The bill calls upon the President, when he reports the result of the census, also to report the result of a problem in arithmetic. If the President did not present the answer to that problem in arithmetic, somebody else would have to do the problem in arithmetic, because no matter what method is embraced for purposes of apportionment, there is inevitably needed a formula which, like a chemical formula, may in itself be somewhat inscrutable, and yet which always reaches the same conclusion." 71 Cong. Rec. 1613 (1929). The accuracy of Senator Vandenberg's

tors, Senator Vandenberg made clear that the bill did not allow the President to change the census figures he received:

"Mr. SWANSON: As I understand, the Senator from Montana says, after reading the bill carefully, that the President is bound and has no discretion under its terms; so that if there should be glaring frauds all over the country he would be compelled to make the apportionment according to the census.

"Mr. WALSH of Montana: I should say so, because as I understand, he is not authorized to disregard any numbers upon any ground.

"Mr. SWANSON: I should like to ask the Senator from Michigan if that is his view? I understand the Senator from Montana to say that if the census returns shall be shown to be reeking with frauds the President will have no power to correct them; that he must follow the census returns as certified, regardless of the fraud that may be involved. Is that the view of the Senator from Michigan?

.            .            .            .            .

"Mr. VANDENBERG: My answer is that the Senator from Montana is entirely correct. There is absolutely no discretion in name or nature reposed in the President in connection with the administration of this proposed act." *Id.*, at 1845–1846.[9]

No President—indeed, no member of the Executive Branch—has ever suggested that the statute authorizes the President to modify the census figures when he performs the

statements is confirmed by the analysis set forth in our opinion in *Department of Commerce* v. *Montana*, 503 U. S., at 448–456.

[9] An opponent of the bill, Senator Black, questioned whether the Act might allow the President more than a ministerial role in the apportionment process. He considered such a possibility a recipe for tyranny. See 71 Cong. Rec. 1612 (1929).

apportionment calculations. Nor did the Solicitor General advance that argument in this litigation.[10] As a matter of practice, the President has consistently and faithfully performed the ministerial duty described by Senator Vandenberg. The Court's suggestion today that the statute gives him discretion to do otherwise is plainly incorrect.[11]

---

[10] While asserting that the President has authority to direct the Secretary's performance of the census, the Solicitor General acknowledged that the statute does not authorize the President to deviate from the Secretary's report:

"MR. ROBERTS: The law directs [the President] to apply, of course, a particular mathematical formula to the population figures he receives, but I don't think there is a limit on his exercise of authority to direct the Secretary of Commerce to conduct the census in a particular manner. It would be unlawful, maybe not subject to judicial review, but unlawful just to say, these are the figures, they are right, but I am going to submit a different statement. But he can certainly direct the Secretary in the conduct of the census.

"QUESTION: But would he have to remand it in effect to the Secretary or could he say, well, I have had somebody over at the FBI making some checks for me and they tell me there are really more people in Massachusetts, so I am going to give them extra seats.

"MR. ROBERTS: I think under the law he is supposed to base his calculation on the figures submitted by the Secretary." Tr. of Oral Arg. 12–13.

[11] The Court confuses two duties of the President: (1) the general duty to supervise the actions of the Secretary of Commerce, and (2) the statutory duty to transmit the census report and the apportionment calculations to Congress. This confusion is evident from the Court's statement, "It is hard to imagine a purpose for involving the President if he is to be prevented from exercising his accustomed supervisory powers over his executive officers." *Ante,* at 800. It may be true that the statute does not purport to limit the President's "accustomed supervisory powers" over the Secretary of Commerce. The President would enjoy these "accustomed powers," however, whether or not he was responsible for transmitting the census and apportionment calculations to Congress. These "accustomed powers," therefore, cannot be relevant in deciding whether agency action is final for the purposes of the APA, or else no action of an Executive department would ever be final. The Court's argument then depends on construing the statute to grant discretion to the President that

Because the Census Act directs that the tabulation of the total population by States shall be "reported by the Secretary to the President," the Court suggests that it is "like a tentative recommendation" to the President, *ante,* at 798. This suggestion is misleading because, unlike the typical "tentative recommendation," the census report is a public document. It is released to the public at the same time that it is transmitted to the President.[12] By law, the census report is distributed to federal and state agencies because it provides the basis for the allocation of various benefits and burdens among the States under a variety of federal programs. The Secretary also transmits the census figures directly to the States to assist them in redistricting. See 13 U. S. C. § 141(c).

This wide distribution provides further evidence that the statute does not contemplate the President's changing the Secretary's report. If the President modified the census figures after he received them from the Secretary, the Federal Government and the States would rely on different census results. The Secretary has made clear that the existence of varying "official" population figures is not acceptable.

---

he would not otherwise enjoy. Such additional grants of authority were implicated in the cases on which the Court relies. See *Chicago & Southern Air Lines, Inc.* v. *Waterman S. S. Corp.,* 333 U. S. 103 (1948); *United States* v. *George S. Bush & Co.,* 310 U. S. 371 (1940). The statutory language here will not bear this interpretation. Moreover, whatever purpose the Court wishes to "imagine" for the statute's designating the President as the official responsible for performing the apportionment calculations, the legislative record makes it absolutely clear that the purpose was *not* to give the President any new discretionary authority over the census. See *supra,* at 810–812, and n. 6.

[12] See United States Department of Commerce News, Bureau of Census, 1990 Census Population for the United States is 249,632,692: Reapportionment Will Shift 19 Seats in the U. S. House of Representatives (Dec. 26, 1990); see also N. Y. Times, Dec. 27, 1990, p. A1, col. 3.

In setting forth guidelines for possible adjustment of the census results,[13] the Secretary stated:

> "The resulting counts must be of sufficient quality and level of detail to be usable for Congressional reapportionment and legislative redistricting, and for all other purposes and at all levels for which census counts are published. . . .
>
> "[T]here can be, for the population at all geographic levels at any one point in time, only one set of official government population figures." 55 Fed. Reg. 9840–9841 (1990).

To ensure uniformity, the Secretary's count must establish the final census figures.[14]

---

[13] The Court asserts that the possibility of census adjustments prior to the President's report to Congress supports its interpretation of the statute. See *ante*, at 797–798. On the contrary, the evidence the Court cites undermines its argument. The President's statement accompanying the transmittal of the 1990 census and apportionment figures to Congress explains, "The Department of Commerce is considering whether to correct these counts and will publish corrected counts, if any, not later than July 15, 1991." H. R. Doc. No. 102–18, p. 1 (1991). The statement underscores that it is the *Secretary*, not the President who determines the final census figures. That the Secretary will "publish" the corrected results also demonstrates that the Court is mistaken in likening the Secretary's report to a "tentative recommendation." *Ante*, at 798.

The possibility that the Secretary may modify the census figures, of course, cannot support the Court's view that the President's intervention deprives the Secretary's action of finality. The possibility of correction would mean, at most, that appellees' challenge was not ripe until the Secretary's eventual announcement that he would not adjust the census. See 56 Fed. Reg. 33582 (1991). Similarly, even if it were the President's report to Congress that signaled the end of a census-adjustment process, that would be relevant only in determining when a challenge is ripe, not whether the Secretary's report is "final agency action."

[14] Even in the Court's view, the Secretary's report of census information to recipients other than the President would certainly constitute "final agency action." The Court's decision thus appears to amount to a pleading requirement. To avoid the bar to APA review that the Court imposes

In light of the statutory language, the legislative history, and the consistent Executive practice, the Court's conclusion that the census report is not "final agency action" is as insupportable as it is surprising.[15]

## III

In view of my conclusion that the census report prepared by the Secretary constitutes final agency action, I must consider the Secretary's contention that judicial review is not available because the conduct of the census is "committed to agency discretion by law." 5 U. S. C. § 701(a)(2).

As we have frequently recognized, the "strong presumption that Congress intends judicial review of administrative action," see, e. g., Bowen v. Michigan Academy of Family Physicians, 476 U. S. 667, 670 (1986), cannot be overcome without " 'clear and convincing evidence' " of a contrary legislative intent, Abbott Laboratories v. Gardner, 387 U. S. 136, 141 (1967) (quoting Rusk v. Cort, 369 U. S. 367, 380 (1962)). No such evidence appears here.

The current version of the statute provides that "[t]he Secretary shall . . . take a decennial census of population as of the first day of April . . . in such form and content as [s]he may determine . . . ." 13 U. S. C. § 141(a).[16] The Secretary

today, litigants need only join their apportionment challenges to other census-related claims. Notwithstanding the Court's novel reading of the statute, in view of the Secretary's insistence on unitary census data, relief on any census claim would yield relief on all other claims.

[15] My conclusion that the Secretary's action was reviewable makes it unnecessary for me to consider whether the President is an "agency" within the meaning of the APA.

[16] Moreover, this language appeared only recently in the statute. The Act passed in 1929 stated: "That a census of population . . . shall be taken by the Director of the Census in the year 1930 and every ten years thereafter." 46 Stat. 21. Before the 1976 amendment, the Act provided: "The Secretary shall, in the year 1960 and every ten years thereafter, take a census of population . . . ." 71 Stat. 483. It was not until 1976 that Congress added the language, "in such form and content as [s]he may determine." To the extent that the argument for unreviewability depends on

asserts that the discretion afforded by the statute is at least as broad as that allowed the Director of Central Intelligence in the statute we considered in *Webster* v. *Doe*, 486 U. S. 592 (1988). That assertion cannot withstand scrutiny. The statute at issue in *Doe* provided that "the Director of Central Intelligence may, in his discretion, terminate the employment of any officer or employee of the Agency whenever he shall deem such termination necessary or advisable in the interests of the United States . . . ." 50 U. S. C. § 403(c). In concluding that employment discharge decisions were committed to agency discretion, we emphasized the language of "deem . . . advisable," which we found to provide no meaningful standard of review. We also relied on the overall statutory structure of the National Security Act.

No language equivalent to "deem . . . advisable" exists in the census statute. There is no indication that Congress intended the Secretary's own mental processes, rather than other more objective factors, to provide the standard for gauging the Secretary's exercise of discretion. Moreover, it

---

this phrase, it requires the conclusion that when Congress amended the statute in 1976, it intended to effect a new, unreviewable commitment to agency discretion. There is no support for this position whatsoever. The main purpose of the 1976 amendment was to provide for a mid-decade census to be used for various purposes (not including apportionment). See S. Rep. No. 94–1256, pp. 2–3 (1976). The legislative history evidences no intention to expand the scope of the Secretary's discretion.

The Senate Report on the new language in 13 U. S. C. § 141(a) reads in its entirety:

"Subsection (a) of section 141 essentially rewords the existing subsection, adding the term 'decennial census of population' so as to distinguish this census, to be taken in 1980 and every ten years thereafter, from the mid-decade census, which is to be taken in 1985 and every ten years thereafter. New language is added at the end of the subsection to encourage the use of sampling and surveys in the taking of the decennial census." S. Rep. No. 94–1256, at 4.

Indeed, other portions of the Act limited the Secretary's authority by requiring, if feasible, the use of sampling in the nonapportionment census. 90 Stat. 2464, 13 U. S. C. § 195.

is difficult to imagine two statutory schemes more dissimilar than the National Security Act and the Census Act. Though they both relate to the gathering of information, the similarity ends there. *Doe* raises the possibility that, except for constitutional claims, the Director of Central Intelligence may enjoy unreviewable discretion to discharge employees. This conclusion accords with the principle of judicial deference that pervades the area of national security. See, *e. g.*, *Department of Navy* v. *Egan*, 484 U. S. 518, 530 (1988); *CIA* v. *Sims*, 471 U. S. 159, 180–181 (1985). While the operations of a secret intelligence agency may provide an exception to the norm of reviewability,[17] the taking of the census does not. The open nature of the census enterprise and the public dissemination of the information collected are closely connected with our commitment to a democratic form of government.[18] The reviewability of decisions relating to the conduct of the census bolsters public confidence in the integrity of the process and helps strengthen this mainstay of our democracy.

More generally, the Court has limited the exception to judicial review provided by 5 U. S. C. § 701(a)(2) to cases involving national security, such as *Webster* v. *Doe* and *Department of Navy* v. *Egan*, or those seeking review of refusal to pursue enforcement actions, see *Heckler* v. *Chaney*, 470 U. S.

---

[17] Indeed, it was asserted in *Webster* v. *Doe*, 486 U. S. 592 (1988), that the statute should be construed to preclude review even of constitutional claims. See *id.*, at 605–606 (O'CONNOR, J., concurring in part and dissenting in part); *id.*, at 621 (SCALIA, J., dissenting) (describing Court's refusal to preclude constitutional review as creating "the world's only secret intelligence agency that must litigate the dismissal of its agents").

[18] See 3 Encyclopedia of the Social Sciences 296 (reprinted in Subcommittee on Energy, Nuclear Proliferation and Federal Services of the Senate Committee on Governmental Affairs, The Decennial Census: An Analysis and Review, 96th Cong., 2d Sess., 461 (Comm. Print 1980)). The tradition of publicity, of course, relates to the tabulated information. The confidentiality of individual responses has long been assured by statute. See 13 U. S. C. §§ 8(b), 9(a); see also *Baldrige* v. *Shapiro*, 455 U. S. 345, 356–358 (1982).

821 (1985); *Southern R. Co.* v. *Seaboard Allied Milling Corp.*, 442 U. S. 444 (1979); *Morris* v. *Gressette*, 432 U. S. 491 (1977). These are areas in which courts have long been hesitant to intrude. The taking of the census is not such an area of traditional deference.[19]

Nor is this an instance in which the statute is so broadly drawn that "'there is no law to apply.'" *Citizens to Preserve Overton Park, Inc.* v. *Volpe*, 401 U. S. 402, 410 (1971) (quoting S. Rep. No. 752, 79th Cong., 1st Sess., 26 (1945)). The District Court found that the overall statutory scheme and the Census Bureau's consistently followed policy provided "law to apply" in reviewing the Secretary's exercise of discretion. 785 F. Supp., at 262. As the District Court explained, the relationship of the census provision contained in 13 U. S. C. § 141 and the apportionment provision contained in 2 U. S. C. § 2a demonstrates that the Secretary's discretion is constrained by the requirement that she produce a tabulation of the "whole number of persons in each State." 2 U. S. C. § 2a(a).[20] This statutory command also

---

[19] The great weight of authority supports the view that the conduct of the census is not "committed to agency discretion by law." See, *e. g.*, *Carey* v. *Klutznick*, 637 F. 2d 834 (CA2 1980); *New York* v. *United States Dept. of Commerce*, 739 F. Supp. 761 (EDNY 1990); *New York* v. *United States Dept. of Commerce*, 713 F. Supp. 48 (EDNY 1989); *Cuomo* v. *Baldrige*, 674 F. Supp. 1089 (SDNY 1987); *Willacoochee* v. *Baldrige*, 556 F. Supp. 551 (SD Ga. 1983); *Carey* v. *Klutznick*, 508 F. Supp. 404 (SDNY 1980); *Philadelphia* v. *Klutznick*, 503 F. Supp. 663 (ED Pa. 1980); *Young* v. *Klutznick*, 497 F. Supp. 1318 (ED Mich. 1980), rev'd on other grounds, 652 F. 2d 617 (CA6 1981), cert. denied *sub nom. Young* v. *Baldrige*, 455 U. S. 939 (1982); *Camden* v. *Plotkin*, 466 F. Supp. 44 (N. J. 1978).

[20] The Census Act provides various other rules, as well, that limit the Secretary's discretion. For example, the statute requires the Secretary to take a decennial census of population "as of the first day of April" in every 10th year. 13 U. S. C. § 141(a). Thus, persons who die in February or March, or who are not born until May or June, are not to be counted. The fact that the statute gives the Secretary broad discretion with respect to the "form and content" of the census surely does not mean that she could lawfully count persons who predeceased the census date or who were

embodies a duty to conduct a census that is accurate and that fairly accounts for the crucial representational rights that depend on the census and the apportionment. The "usual residence" policy that has guided the census since 1790 provides a further standard by which to evaluate the Secretary's exercise of discretion. See generally *Heckler* v. *Chaney*, 470 U. S., at 836; *Motor Vehicle Mfrs. Assn. of United States, Inc.* v. *State Farm Mut. Automobile Ins. Co.*, 463 U. S. 29, 41–43 (1983); *Padula* v. *Webster*, 822 F. 2d 97, 100, 261 U. S. App. D. C. 365, 368 (1987). The District Court was clearly correct in concluding that the statutory framework and the long-held administrative tradition provide a judicially administrable standard of review.[21]

## IV

For the reasons stated in Part IV of the Court's opinion, I agree that the inclusion of overseas employees in state census totals does not violate the Constitution.[22]    I turn now to

---

born thereafter.   Similarly, it would be plain error to count as Massachusetts residents a family that moved from New York to Boston on June 1.

[21] Nothing in the language of the statute or in the overall statutory scheme supports the Secretary's alternative argument that this is an instance in which the relevant "statutes preclude judicial review." 5 U. S. C. § 701(a)(1).   In the absence of express statutory language, we have generally reserved that exception for cases in which the existence of an alternative review procedure provided "clear and convincing evidence," *Bowen* v. *Michigan Academy of Family Physicians*, 476 U. S. 667, 671 (1986) (citations and internal quotation marks omitted), of a legislative intent to preclude judicial review.   See, *e. g.*, *Department of Navy* v. *Egan*, 484 U. S. 518, 530–533 (1988); *NLRB* v. *Food & Commercial Workers*, 484 U. S. 112, 130–133 (1987); *Block* v. *Community Nutrition Institute*, 467 U. S. 340, 346–348 (1984).   No such alternative scheme appears here.   The ability of Congress, itself, to resolve apportionment issues by enacting new laws does not provide any evidence of an intent to preclude judicial review.

[22] I believe that appellees' challenge to the use of "home of record" data also merits brief consideration.

The contention that overseas personnel may have little connection with their "home of record" clearly has some force.   A person designates a

appellees' contention that the Secretary's decision to include overseas federal employees was arbitrary and capricious and should have been set aside under the APA.

With the exception of the census conducted in 1900, overseas federal employees were not included in state census totals before 1970.[23] In the census conducted in 1970, during the Vietnam War, overseas military personnel were assigned to States for apportionment purposes based on the "home of record" appearing in their personnel files.[24] The Bureau reverted to its previous policy of excluding overseas employees from apportionment totals in the 1980 census. In explaining this decision, one of the reasons cited by Bureau officials was the "unknown reliability" of the data relied on to determine the "home State" of overseas personnel. App. 55. In discussions with the Bureau and in testimony before Congress, officials of the Defense Department agreed that "home of record" data had a high "error rate" and might have little correlation with an employee's true feelings of affiliation. See id., at 124, 183.

In July 1989, then-Secretary Mosbacher decided to include overseas employees in state population figures in the 1990

---

"home of record" when entering the service and is not permitted to change it thereafter. See App. 147, n. 5. This information may therefore be quite stale, implicating the constitutional requirements of accuracy and decenniality.

The special problems of including overseas personnel in the census, though, necessitate difficult judgments about the best data to use. In view of the discretion available to the Secretary in formulating residence rules, the adoption of the "home of record" principle cannot be said to transgress any constitutional command. Accuracy in this context is clearly a comparative concept, and appellees have not demonstrated that the constitutional requirement of accuracy dictates a different method of determining residence.

Like the District Court, I also conclude that the Secretary's decision did not violate any specific provision of the Census Act. See 785 F. Supp., at 266, n. 31.

[23] See App. 175–177.

[24] See id., at 57.

census.[25] The decision memorandum approved by the Secretary described several reasons for this conclusion, including "growing bipartisan concern of the Congress" and the belief of the Defense Department that its employees should be included in apportionment calculations because they considered themselves to be "usual residents" of the United States. *Id.*, at 120. The prospect of more accurate data than previously available also contributed to the decision. The memorandum stated that the Defense Department's plans to conduct an enumeration of its employees provided a "significant reason" for the decision. *Id.*, at 121; see also *id.*, at 184. In December 1989, however, a lack of funds led the Defense Department to cancel the survey. *Ibid.* The Secretary nevertheless adhered to the decision to include overseas personnel.

In reaching the ultimate decision to allocate overseas federal employees to States, the Secretary had an obligation to "examine the relevant data and articulate a satisfactory explanation for [the] action including a 'rational connection between the facts found and the choice made.'" *State Farm,* 463 U. S., at 43 (quoting *Burlington Truck Lines, Inc.* v. *United States,* 371 U. S. 156, 168 (1962)). The District Court was properly concerned by the scant evidence that the Secretary reconsidered the apportionment policy following the cancellation of the Defense Department survey. If the justification for the decision no longer obtained, the refusal to reconsider would be quite capricious. The District Court was certainly correct in concluding that "[i]nertia cannot supply the necessary rationality" for the Secretary's decision. 785 F. Supp., at 265.

While the question is a close one, two factors in particular lead me to conclude that the decision to include overseas employees ultimately rested on more than inertia. First, the Secretary received assurances from the Defense Department

---

[25] *Id.*, at 182.

that, even without the survey, information on overseas personnel would be "supplemented and improved," App. 161, and would thus be more accurate than the data available in the past. Moreover, while the anticipated Defense Department survey played an important role in the Secretary's initial decision, other factors cited in the memorandum continued to support the Secretary's choice to include overseas personnel.

The record could be more robust. However, the basis for the agency's decision need not appear with "ideal clarity," *Bowman Transportation, Inc.* v. *Arkansas-Best Freight System, Inc.,* 419 U. S. 281, 286 (1974), as long as it is reasonably discernible. As the Court explains, see *ante,* Part IV, the Secretary had discretion to include overseas personnel in the census count. Although the hopes for more accurate data were not fully realized, the record discloses that the decision to include overseas personnel continued to be supported by valid considerations. I therefore conclude that the decision of the Secretary was not arbitrary or capricious.[26]

For these reasons, I concur in the Court's judgment, but only in Part IV of its opinion.

JUSTICE SCALIA, concurring in part and concurring in the judgment.

I agree with the Court that appellees had no cause of action under the judicial-review provisions of the Administrative Procedure Act (APA), 5 U. S. C. § 701 *et seq.,* and I therefore join Parts I and II of its opinion.

Appellees have also challenged the constitutionality of the allocation methods used by the Secretary of Commerce in conducting the census. The Court concludes that they have

---

[26] The record indicates that the Secretary considered the alternative methods of allocating overseas employees to States and that the choice of "home of record" data was certainly not arbitrary or capricious. See, *e. g.,* App. 162.

standing to assert these claims, but that the claims are meritless.[1]   I disagree with the Court's conclusion on the standing question, and therefore do not reach the merits.   Our cases have established that there are three elements to the "irreducible constitutional minimum of standing" required by Article III: (1) the plaintiffs must establish that they have suffered "injury in fact"; (2) they must show causation between the challenged action and the injury; and (3) they must establish that it is likely that the injury will be redressed by a decision in their favor.  *Lujan* v. *Defenders of Wildlife,* 504 U. S. 555, 560 (1992).   Appellees have clearly satisfied the first two requirements, but I think they founder on the third.

The plurality concludes that declaratory relief directed at the Secretary alone would be sufficient to redress appellees' injury.  *Ante,* at 803.   I do not agree.   Ordering the Secretary to recalculate the final census totals will not redress appellees' injury unless the President accepts the new numbers, changes his calculations accordingly, and issues a new reapportionment statement to Congress, and the Clerk of the House then submits new certificates to the States.   13 U. S. C. § 141(b); 2 U. S. C. § 2a.   I agree that, in light of the Clerk's purely ministerial role, we can properly assume that insofar as *his* participation is concerned the sequence of events will occur.   But as the Court correctly notes, *ante,* at 797–800, the President's role in the reapportionment process is *not* purely ministerial; he is not "required to adhere to the policy decisions reflected in the Secretary's report," *ante,* at 799.   I do not think that for purposes of the Article III redressability requirement we are *ever* entitled to assume, no matter how objectively reasonable the assumption may be, that the President (or, for that matter, any official of the Ex-

---

[1] Although only a plurality of the Court joins that portion of JUSTICE O'CONNOR's opinion which finds standing (Part III), I must conclude that the *Court* finds standing since eight Justices join Part IV of the Court's opinion discussing the merits of appellees' constitutional claims.

ecutive or Legislative Branches), in performing a function that is not wholly ministerial, will follow the advice of a subordinate official. The decision is by Constitution or law conferred upon him, and I think we are precluded from saying that it is, in practical effect, the decision of someone else. Indeed, judicial inquiry into or speculation about the probability of such "practical" subservience—never mind acting upon the outcome of such inquiry or speculation—seems to me disrespectful of a coordinate branch. On such a theory of redressability, suit would lie (assuming injury-in-fact could be shown) against the members of the President's Cabinet, or even the members of his personal staff, for the almost-sure-to-be-followed advice they give him in their respective areas of expertise.

The plurality, however, has a different theory of redressability. In its view, it suffices that the "authoritative interpretation of the census statute and constitutional provision" rendered by the District Court will induce the President to submit a new reapportionment that is consistent with what the District Court judgment orders the Secretary to submit. *Ante*, at 803. It seems to me this bootstrap argument eliminates, rather than resolves, the redressability question. If courts may simply assume that everyone (including those who are not proper parties to an action) will honor the legal rationales that underlie their decrees, then redressability will *always* exist. Redressability requires that the court be able to afford relief *through the exercise of its power*, not through the persuasive or even awe-inspiring effect of the opinion *explaining* the exercise of its power. It is the Court's *judgment*, in other words, its injunction to the Secretary of Commerce, that must provide appellees relief—not its accompanying excursus on the meaning of the Constitution.

Though the Court does not rely upon it, the judgment sought here *did* run against the President of the United States. The District Court's order expressly required, not

only that a new census tabulation be prepared, but also that the President issue a new certification and that the Clerk of the House forward the new apportionment to the 50 Governors. It is a commentary upon the level to which judicial understanding—indeed, even judicial awareness—of the doctrine of separation of powers has fallen, that the District Court entered this order against the President without blinking an eye. I think it clear that no court has authority to direct the President to take an official act.

We have long recognized that the scope of Presidential immunity from judicial process differs significantly from that of Cabinet or inferior officers. Compare *Nixon* v. *Fitzgerald*, 457 U. S. 731, 750 (1982) ("The President's unique status under the Constitution distinguishes him from other executive officials"), with *Harlow* v. *Fitzgerald*, 457 U. S. 800, 811, n. 17 (1982) ("Suits against other officials—including Presidential aides—generally do not invoke separation-of-powers considerations to the same extent as suits against the President himself"). Although we held in *United States* v. *Nixon*, 418 U. S. 683 (1974), that the President is not *absolutely* immune from judicial process, see also *United States* v. *Burr*, 25 F. Cas. 30 (No. 14,692d) (CC Va. 1807) (Marshall, C. J.) (upholding subpoena directed to President Jefferson), the order upheld there merely required the President to provide information relevant to an ongoing criminal prosecution, which is what any citizen might do; it did not require him to exercise the "executive Power" in a judicially prescribed fashion. We have similarly held that Members of Congress can be subpoenaed as witnesses, see *Gravel* v. *United States*, 408 U. S. 606, 615 (1972), citing *United States* v. *Cooper*, 4 Dall. 341 (CC Pa. 1800) (Chase, J., sitting on Circuit), though there is no doubt that we cannot direct *them* in the performance of their constitutionally prescribed duties, see *Eastland* v. *United States Servicemen's Fund*, 421 U. S. 491 (1975) (refusing to enjoin the issuance of a congressional subpoena).

I am aware of only one instance in which we were specifically asked to issue an injunction requiring the President to take specified executive acts: to enjoin President Andrew Johnson from enforcing the Reconstruction Acts. As the plurality notes, *ante*, at 802–803, we emphatically disclaimed the authority to do so, stating that " 'this court has no jurisdiction of a bill to enjoin the President in the performance of his official duties.' " *Mississippi* v. *Johnson*, 4 Wall. 475, 501 (1867). See also C. Burdick, The Law of the American Constitution § 50, pp. 126–127 (1922); C. Pyle & R. Pious, The President, Congress, and the Constitution 170 (1984) ("No court has ever issued an injunction against the president himself or held him in contempt of court"). The apparently unbroken historical tradition supports the view, which I think implicit in the separation of powers established by the Constitution, that the principals in whom the executive and legislative powers are ultimately vested—viz., the President and the Congress (as opposed to their agents)—may not be ordered to perform particular executive or legislative acts at the behest of the Judiciary.[2]

For similar reasons, I think we cannot issue a declaratory judgment against the President. It is incompatible with his constitutional position that he be compelled personally to defend his executive actions before a court. Many of the reasons we gave in *Nixon* v. *Fitzgerald*, *supra*, for acknowledging an absolute Presidential immunity from civil damages for official acts apply with equal, if not greater, force to requests for declaratory or injunctive relief in official-capacity suits that challenge the President's performance of executive functions: The President's immunity from such judicial relief is

---

[2] In *Mississippi* v. *Johnson*, 4 Wall. 475 (1867), we left open the question whether the President might be subject to a judicial injunction requiring the performance of a purely "ministerial" duty, see *id.*, at 498–499; cf. *Kendall* v. *United States ex rel. Stokes*, 12 Pet. 524 (1838) (Postmaster General); *Marbury* v. *Madison*, 1 Cranch 137 (1803) (Secretary of State). As discussed earlier, the President's duty here was not that.

"a functionally mandated incident of the President's unique office, rooted in the constitutional tradition of the separation of powers and supported by our history." *Id.,* at 749; see also *id.,* at 749–757; *id.,* at 760–764 (Burger, C. J., concurring).[3] Permitting declaratory or injunctive relief against the President personally would not only distract him from his constitutional responsibility to "take Care that the Laws be faithfully executed," U. S. Const., Art. II, §3, but, as more and more disgruntled plaintiffs add his name to their complaints, would produce needless head-on confrontations between district judges and the Chief Executive. (If official-action suits against the President had been contemplated, surely they would have been placed within this Court's original jurisdiction.) It is noteworthy that in the last substantive section of *Nixon* v. *Fitzgerald* where we explain why "[a] rule of absolute immunity for the President will not leave the Nation without sufficient protection against misconduct on the part of the Chief Executive," 457 U. S., at 757, because of "[t]he existence of alternative remedies and deterrents," *id.,* at 758, injunctive or declaratory relief against the President is not mentioned.

None of these conclusions, of course, in any way suggests that Presidential action is *unreviewable.* Review of the legality of Presidential action can ordinarily be obtained in a suit seeking to enjoin the officers who attempt to enforce the President's directive, see, *e. g., Youngstown Sheet & Tube Co.* v. *Sawyer,* 343 U. S. 579 (1952); *Panama Refining Co.* v. *Ryan,* 293 U. S. 388 (1935)—just as unlawful legislative ac-

---

[3] Although the relief granted in *Powell* v. *McCormack,* 395 U. S. 486 (1969), was only declaratory, and although we reserved the question whether *coercive* relief could properly be granted against the congressional officers, we discussed the issue of the form of relief only *after* having concluded that the actions of these officers were not protected by legislative immunity, *id.,* at 517–518. Accordingly, nothing in the case suggests that declaratory relief may be awarded for actions protected by congressional (or Presidential) immunity.

tion can be reviewed, not by suing Members of Congress for the performance of their legislative duties, see, *e. g., Powell* v. *McCormack,* 395 U. S. 486, 503–506 (1969); *Dombrowski* v. *Eastland,* 387 U. S. 82 (1967); *Kilbourn* v. *Thompson,* 103 U. S. 168 (1881), but by enjoining those congressional (or executive) agents who carry out Congress's directive. Unless the other branches are to be entirely subordinated to the Judiciary, we cannot direct the President to take a specified executive act or the Congress to perform particular legislative duties.

In sum, we cannot remedy appellees' asserted injury without ordering declaratory or injunctive relief against appellant President Bush, and since we have no power to do that, I believe appellees' constitutional claims should be dismissed.[4] Since I agree with the Court's conclusion that appellees' constitutional claims do not provide an alternative ground that would support the judgment below, I concur in its judgment reversing the District Court.

---

[4] A contrary conclusion is not required by the fact that in *Department of Commerce* v. *Montana,* 503 U. S. 442 (1992), we reached the merits of a challenge to the President's use of the method of equal proportions in calculating the reapportionment. "'[W]hen questions of jurisdiction have been passed on in prior decisions *sub silentio,* this Court has never considered itself bound when a subsequent case finally brings the jurisdictional issue before us.'" *Pennhurst State School and Hospital* v. *Halderman,* 465 U. S. 89, 119 (1984) (quoting *Hagans* v. *Lavine,* 415 U. S. 528, 533, n. 5 (1974)).