157 F.3d 1190
 98 Cal. Daily Op. Serv. 7750, 98 Daily Journal
D.A.R. 10,749
Carlotta Leon GUERRERO, individually and as a Member of the
Twenty-Third Guam Legislature; Government of the Territory
of Guam; Commonwealth of the Northern Mariana Islands;
State of Hawaii, Petitioners-Appellees,
v.
William J. CLINTON, President of the United States; Bruce
Babbit, Secretary of the Department of Interior;
Allen P. Stayman, Director, Office of
Insular Affairs, Respondents-Appellants.
 No. 97-16395.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted May 4, 1998.
Decided Oct. 13, 1998.
 
 Michael S. Raab, United States Department of Justice, Washington, DC, for respondents-appellants.
 Jerry E. Hogan, Hogan & Bronze, Agana, GU, for petitioners-appellees Carlotta Leon Guerrero and the Government of Guam; Robert B. Dunlap II, Deputy Attorney General, Saipan, Commonwealth of the Northern Mariana Islands, for petitioner-appellee Commonwealth of the Northern Mariana Islands; Madeleine Austin, Deputy Attorney General, Honolulu, HI, for petitioner-appellee State of Hawaii.
 Appeal from the United States District Court for the District of Guam; John S. Unpingco, District Judge, Presiding. D.C. No. CV-95-00135-JSU.
 Before: BROWNING, BRUNETTI, and RYMER, Circuit Judges.
 Opinion by Judge RYMER; Concurrence by Judge BROWNING.
 RYMER, Circuit Judge:
 
 
 1
 This is a challenge by Carlotta Leon Guerrero, a Guam legislator, the Government of the Territory of Guam, the Commonwealth of the Northern Mariana Islands (CNMI), and the State of Hawaii,[1] to the failure of the Director of the Office of Insular Affairs[2] to issue a report to Congress annually as required by the Compact of Free Association Act of 1985, 48 U.S.C. § 1904(e)(2), and to the failure of the cumulative report submitted in 1996 (after this litigation was commenced) adequately to address the impact of the Compact. The Director appeals the district court's summary judgment and order requiring him to file reports, holding the 1996 report deficient, and ordering him to furnish information that Congress did not specifically ask for in § 1904(e).
 
 
 2
 We must decide whether Guerrero and Guam, CNMI, and Hawaii, whose economies may be adversely affected by the Compact, have standing to pursue this challenge. A related question is whether we can review the adequacy of the Director's 1996 report under the Administrative Procedure Act (APA), 5 U.S.C. § 702, or the Mandamus and Venue Act (MVA), 28 U.S.C. § 1361. In the unusual circumstances of this case, the inquiries essentially collapse. Because Congress asked for the reports primarily for its own use and the reports themselves trigger no legal consequences, we conclude that the adequacy of the report is not reviewable, and the injury asserted by the governments is correspondingly not redressable. Accordingly, we reverse.
 
 
 3
 * In January 1986, Congress adopted the Compact of Free Association Act of 1985, Pub.L. No. 99-239, 99 Stat. 1770 (1986), approving a Compact of Free Association between the United States and the Governments of the Federated States of Micronesia and the Republic of the Marshall Islands. 48 U.S.C. § 1901.[3] Among other provisions, the Compact authorized citizens of Micronesia and the Marshall Islands freely to "enter into, lawfully engage in occupations, and establish residence as a nonimmigrant in the United States and its territories and possessions." See 99 Stat. at 1804. However, Congress declared its intent that the Compact not "cause any adverse consequences for the United States territories and commonwealths or the State of Hawaii." 48 U.S.C. § 1904(e)(1).
 
 
 4
 The Act requires the President (now the Director, his designee) to report annually to Congress "with respect to the impact of the Compact on the United States territories and commonwealths and on the State of Hawaii." 48 U.S.C. § 1904(e)(2).[4] The legislative history suggests this came about to further the Congressional objective of avoiding adverse consequences. See H.R.Rep. No. 99-188 at 53, reprinted in 1985 U.S.C.C.A.N. 2746, 2798. The reports are to focus on trade, taxation, immigration, labor laws, minimum wages, social systems and infrastructure, and environmental regulation. 48 U.S.C. § 1904(e)(2). Views of the government of the State of Hawaii and of each of the United States territories and commonwealths (plus Micronesia, the Marshall Islands and Palau) are to be requested and transmitted to Congress along with the reports. 48 U.S.C. § 1904(e)(3). Finally, Congress declared as part of the Compact that "if any adverse consequences to United States territories and commonwealths or the State of Hawaii result from implementation of the Compact," the Congress "will act sympathetically and expeditiously to redress those adverse consequences." 48 U.S.C. § 1904(e)(4). And it authorized "such sums as may be necessary to cover the costs, if any, incurred by the State of Hawaii, the territories of Guam and American Samoa, and the Commonwealth of the Northern Mariana Islands resulting from any increased demands placed on educational and social services by immigrants from the Marshall Islands and the Federated States of Micronesia" to be appropriated for fiscal years after 1985. 48 U.S.C. § 1904(e)(6).
 
 
 5
 A report was submitted in 1989, but no further reports were submitted until 1996. Meanwhile, the evidence shows that communications were ongoing between Interior and Congress regarding the effect of the Compact on Guam and CNMI.[5] In 1995, Congress appropriated aid to Guam for Compact costs and earmarked a portion of its annual grants to CNMI for Compact costs. See The Impact of the Compacts of Free Association of the United States Territories and Commonwealths and on the State of Hawaii (September 1996). In 1996, Congress committed to multi-year appropriations to Guam for Compact costs and to extended funding to CNMI for infrastructure expenses. Id.
 
 
 6
 The governments brought this action in November 1995, seeking declaratory and mandamus relief. They requested an order compelling the Director to submit annual reports to Congress addressing the impact of the Compact and a declaration that the Director owes the governments "a non-discretionary duty ... to prepare annual reports to the U.S. Congress about the Compact's adverse financial impact" on them. In September 1996, the Director submitted to Congress a report that addressed the cumulative impact of the Compact on the governments from 1989 to 1996.[6]
 
 
 7
 The Director moved to dismiss the action on the grounds that the 1996 report mooted the governments' complaint, they lacked standing to pursue it, and in any event there was no final agency action reviewable under the APA. The district court denied the motion to dismiss, holding that the controversy was not moot as the governments had contested the adequacy of the report and the "capable of repetition yet evading review" exception to mootness applied to the Director's failure to submit an annual report; the governments had standing as they had alleged a sufficiently concrete injury traceable to an absent or inadequate § 1904(e)(2) report and redressable by a court order to submit an adequate report; and that, given the mandatory language of § 1904(e) and the presumption of reviewability, it had authority under the APA to review both the failure to submit a report and the submission of an allegedly inadequate report. Thus, the district court held that mandamus and declaratory relief were appropriate.
 
 
 8
 The governments then moved for summary judgment. Noting that the only issue before it was "whether the current report was a reasonable exercise of agency discretion," the district court declared that the Director's September 1996 report was "arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law." Accordingly, it ordered the Director to submit annual reports that include the information identified in § 1904(e)(2), and in addition to address the financial impact of Compact immigration on the governments; to set forth the sources of all data relied upon; to identify the methodology and analysis used in identifying the adverse consequences; and to identify any assumptions made in reaching those conclusions.
 
 
 9
 The Director timely appealed both the summary judgment and the denial of his motion to dismiss.
 
 II
 
 10
 The Director argues that the governments lack standing to compel him to comply with the statutory reporting requirement for the principal reason that their only concrete interest is the failure of Congress to act sympathetically to redress the Compact's adverse consequences, and that interest is neither fairly traceable to the Director's conduct nor redressable by the relief requested. He maintains that § 1904(e) was not intended to confer any judicially enforceable rights on the governments and that it is up to Congress to decide whether the Executive Branch has supplied the information Congress has requested. Regardless, the Director submits, even if the governments have standing, their challenge is not subject to review under either the APA or the Mandamus Act because the submission of informational reports to Congress is not "agency action," 5 U.S.C. § 702, and such reports carry no legal consequences.
 
 
 11
 Hawaii and CNMI contend that § 1904(e)(3) confers a procedural right on them to have their views transmitted to Congress as part of the Director's reports. They analogize the purpose underlying § 1904(e) to that underlying the National Environmental Policy Act, 42 U.S.C. § 4332(C), and the National Historic Preservation Act, 16 U.S.C. § 470f, which create procedural obligations to generate information about the impact of federal actions. Both claim an interest in not having Compact impact overlooked as a result of the failure to file a report or as a result of the report's inadequacies. And, they say, they've shown nonspeculative injury to their concrete interests as even the 1996 report shows the presence of diseases and adverse effects on law enforcement as a result of Compact immigration. Further, Hawaii and CNMI contend that their injury does not fail to be redressable (under the more relaxed redressability standard that applies when procedural injury is at stake) simply because the ultimate decision involves a number of factors and congressional action. Rather, they are injured by the Director's failure to file adequate reports while they are suffering adverse consequences.[7] Finally, the governments argue that the Director's failure to dispatch a mandatory statutory duty is action or inaction that results in legal consequences because the requirement is intertwined with the Compact treaties and directly affects their obligations for public health and safety. It is, therefore, presumptively reviewable under APA §§ 702 and 704, and the Director has failed to show that judicial review was meant to be precluded. In any event, the governments conclude, mandamus is appropriate because they are the ultimate beneficiaries of the information contained in the reports.
 
 
 12
 Although the governments' complaint alleges that the Director's failure to submit complete reports deprived them of "the benefit of the statutory commitment to act sympathetically and to expeditiously redress the adverse consequences from implementation of the Compact," the governments recognize that they lack standing to contest the absence of appropriations and focus instead on the harm caused to their interest in being free from the adverse consequences of the Compact by the Director's failure to comply with his obligations. In short, as the governments see it, standing turns on their "procedural right" to protect concrete interests; if so, footnote 7 of Lujan v. Defenders of Wildlife, 504 U.S. 555, 572, n. 7, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992), states that the normal standards for redressability and immediacy are relaxed. See also Douglas County v. Babbitt, 48 F.3d 1495, 1500-01 (9th Cir.1995), cert. denied, 516 U.S. 1042, 116 S.Ct. 698, 133 L.Ed.2d 655 (1996).[8]
 
 
 13
 However, we do not need to decide how far footnote 7 stretches, for even assuming that concrete interests of the governments are affected, there is nothing that can be done by way of judicial review to redress the adverse consequences of the Compact that they say they are suffering. This is because only Congress can do that, and nothing that we could order with respect to the reports or their adequacy can make Congress do anything.
 
 
 14
 This becomes clear by focusing on what is really at issue in this case. There is no dispute that the Director has to submit reports to Congress: he has been doing so for three years, and he acknowledges (as he must) the obligation imposed on the Executive Branch by § 1904(e)(2). Nor do the governments claim that the Director refused to request their views or to transmit them as part of his 1996, 1997 or 1998 reports, as the Director is also obliged to do. Thus, the only controversy is whether the 1996 report was adequate and what kind of information must be provided in future reports. But no legal consequences flow from the report. No matter what it says or how much it says, the report is simply a document submitted to Congress that Congress has no obligation to consider, let alone act upon.[9] Submitting a § 1904(e)(2) report does not cause Congress to "act sympathetically," nor is it in any way the sine quo non to receiving Compact aid. Instead, it is purely informational. Although a more detailed report or a report that highlights impact more emphatically might have a better chance of getting some member of Congress's attention, it carries no greater clout than that. Likewise, since the Director makes no decisions, enacts no rules, and has no authority over the governments or Compact immigration or compensation for impact, what he says in the report has no effect on any right or obligation of anyone.
 
 
 15
 In sum, no legal consequences flow from a § 1904(e)(2) report and it has no "determinative or coercive effect upon the action of someone else" that in turn produced the governments' injury. Bennett v. Spear, 520 U.S. 154, 117 S.Ct. 1154, 1164, 137 L.Ed.2d 281 (1997). Therefore, the relief requested (a better report) cannot make any legal difference that will redress the governments' injury from Compact impact. See Steel Co. v. Citizens for a Better Env't, --- U.S. ----, ----, 118 S.Ct. 1003, 1019, 140 L.Ed.2d 210 (1998) ("Relief that does not remedy the injury suffered cannot bootstrap a plaintiff into federal court; that is the very essence of the redressability requirement.").
 
 
 16
 By the same token, the report is not agency action of the sort that is typically subject to judicial review. See Bennett, 117 S.Ct. at 1168 (agency action is "final" and thereby subject to judicial review only if "the action [is] one by which rights or obligations have been determined, or from which legal consequences will flow") (citation and quotations omitted). Because it triggers no legal consequences and determines no rights or obligations, no check on the substance of the report is necessary. Having requested the report, Congress, not the judiciary, is in the best position to decide whether it's gotten what it wants.
 
 
 17
 This is best explained by the D.C. Circuit's opinion in Natural Resources Defense Council, Inc. v. Hodel, 865 F.2d 288, 316-19 (D.C.Cir.1988). There, California challenged the Secretary of the Interior's off-shore leasing program under Section 111 of Public Law 99-591, which authorized the Secretary to consider and accept any proposal regarding California leasing and directed the Secretary to "indicate in detail why any specific portion of the proposals ... was not accepted" and to include this response along with his submission of a final program to Congress. Hodel, 865 F.2d at 316. In the state's view, the Secretary failed to fulfill the mandate of § 111 because adequate explanations weren't given for rejecting parts of the proposals. Concluding that California's claim was not susceptible of judicial review, the court noted that § 111 was essentially a reporting provision that is different from the prototypical kind of agency action which is subject to the general presumption of reviewability, in that, among other things, it was not an exercise of authority delegated by Congress akin to rulemaking or adjudicatory functions. Further:
 
 
 18
 Executive responses to congressional reporting requirements of the kind presented here represent, we believe, an entirely different sort of agency action. Under the reporting requirement before us, the designated Executive Branch officer is simply reporting back to the source of its delegated power in accordance with the Article I branch's instructions. Lacking a provision for judicial review, the measure before us embodies a requirement that by its nature seems singularly committed to congressional discretion in measuring the fidelity of the Executive Branch actor to legislatively mandated requirements. Here, the contention is not that the Secretary failed entirely to report back to Congress (and the Governor),[10] but that the Secretarial response lacked the requisite "detail." This had the unfortunate effect, we are told, of hampering on-going negotiations between Congress and the Executive. But this seems to us a judgment peculiarly for Congress to make in carrying on its own functions in our constitutional system, not for non-congressional parties to carry on as an ersatz proxy for Congress itself. If the Secretary's response has indeed been deemed inadequate (in the statutory sense of "insufficiently detailed") by its recipient, then it is most logically for the recipient of the report to make that judgment and take what it deems to be the appropriate action. It scarcely bears more than passing mention that the most representative branch is not powerless to vindicate its interests or ensure Executive fidelity to Legislative directives. In short, in the absence of a congressional directive for judicial review of claims by non-congressional parties, this issue seems to us quintessentially within the province of the political branches to resolve as part of their ongoing relationships.
 
 
 19
 Id. at 318-19 (footnote omitted). We agree, as we do with the court's additional point that under the circumstances of this kind of reporting provision, "we despair at formulating judicially manageable standards by which to gauge the fidelity of the Secretary's response" to the statutory strictures. Id. at 319. Rather,
 
 
 20
 what counsels restraint on our part in this case is the reality of a governmental culture, as it were, based on ongoing relationships between the two political branches in our system of separated powers. Generally, congressional reporting requirements are, and heretofore have been, a management tool employed by Congress for its own purposes. We decline to take the remarkable step, rife with the danger of flooding an already over-burdened judicial system with failure-to-report cases, of reviewing petitioners' ... claim when Congress has not provided for judicial scrutiny of this aspect of the interbranch relationship. Under these circumstances, the presumption of reviewability of agency action is woefully inapposite.
 
 
 21
 Id. For the same reasons, we conclude that § 1904(e)(2) reports are not reviewable.
 
 
 22
 We recognize that the governments are frustrated and believe that an order to do a better report will help. Yet they can make the same point in the views they submit for transmittal as part of the Director's report to Congress.[11] If Congress agrees that more or different information is required, or that a different regime should be put in place, it can "take what it deems to be the appropriate action." Hodel, 865 F.2d at 319; see also Taylor Bay Protective Assoc. v. EPA, 884 F.2d 1073, 1080 (8th Cir.1989) (provision in Flood Control Act authorizing Secretary of the Army to review and comment on engineering projects was not reviewable). Meanwhile, given the absence of any provision for judicial review of § 1904(e)(2) reports and of any legal consequences flowing from them, "it is Congress's role to determine the adequacy of the study and report, not the courts." Id.; Hodel, 865 F.2d at 319.
 
 
 23
 Japan Whaling Ass'n v. American Cetacean Society, 478 U.S. 221, 106 S.Ct. 2860, 92 L.Ed.2d 166 (1986), upon which both the governments and the district court rely, does not suggest otherwise for the statutory structure there was quite different from here. Under the Packwood Amendment to the Magnuson Fishery Conservation and Management Act, 16 U.S.C. § 1821(e)(2)(B), the Secretary of Commerce's certification to the President that another country was endangering an international fishery conservation program, "automatically triggered sanctions by the Secretary of State ... regardless of any discretionary action the President himself decided to take." Franklin v. Massachusetts, 505 U.S. 788, 798-99, 112 S.Ct. 2767, 2774-2775, 120 L.Ed.2d 636 (1992) (discussing Japan Whaling ). Because this determination had legal consequences, the Secretary's decision not to certify that Japan was in violation also had legal consequences, and thus was reviewable. By contrast, no legal consequences attach one way or the other to the report and recommendations of the Director under the Compact of Free Association Act.
 
 
 24
 Nor is judicial review otherwise required simply because the Director failed to file reports between 1989 and 1996. The governments suggest that the exception to the "final agency decision" requirement for alleged delay in reaching a decision applies, relying on Independence Mining Co. v. Babbitt, 105 F.3d 502, 511 (9th Cir.1997), but the Director's "delay" has now been remedied. His past failure (which cannot be redressed in any event) affords no basis for reviewing the 1996 cumulative report, or subsequent reports, for adequacy.
 
 
 25
 Accordingly, we hold that the adequacy of the 1996 and subsequent reports is not reviewable, and the injury asserted by the governments is correspondingly not redressable, because the § 1904(e)(2) report that Congress asked for is primarily a tool for its own use, without cognizable legal consequences. We therefore reverse the district court's orders to the contrary. On remand, the governments' action must be dismissed.
 
 III
 
 26
 The governments argue that they are entitled to mandamus relief whether or not their claims are reviewable under the APA. However, mandamus is available only when "(1) the plaintiff's claim is clear and certain; (2) the duty is ministerial and so plainly prescribed as to be free from doubt; and (3) no other adequate remedy is available." Oregon Natural Resources Council v. Harrell, 52 F.3d 1499, 1508 (9th Cir.1995) (citations and quotations omitted). Assuming standing as well as a mandatory duty to submit § 1904(e)(2) reports, there is no question that submitting "adequate" reports is neither "ministerial" nor "free from doubt." Clearly, then, mandamus relief is not available in this action.
 
 
 27
 REVERSED.
 
 
 28
 JAMES R. BROWNING, Circuit Judge, concurring separately:
 
 
 29
 I join in the decision and in Judge Rymer's opinion. I write separately to emphasize my understanding that the court makes no ruling on the relaxed redressability test for procedural standing. The governments' alleged injury is not redressable because the adequacy of the reports, the only pending dispute, is not subject to judicial review for the reasons stated in Hodel.
 
 
 
 [1]
 Unless the context otherwise requires, we shall refer to the plaintiffs collectively as "the governments."
 
 
 [2]
 By statute the reporting obligation is imposed on the President, although the President delegated his responsibilities to the Secretary of the Department of the Interior by Executive Order No. 12569 (October 16, 1986), and the Secretary has in turn designated the Director of the Office of Insular Affairs as the responsible official. We shall therefore refer to the United States defendants collectively as "the Director." President Clinton is a named defendant although Guerrero no longer proceeds against him. As she recognizes, the President is not an agency within the APA and is thus not subject to its provisions, see Franklin v. Massachusetts, 505 U.S. 788, 797, 112 S.Ct. 2767, 120 L.Ed.2d 636 (1992), and mandamus against the President would be "extraordinary." Id. at 802, 112 S.Ct. 2767
 
 
 [3]
 A similar Compact of Free Association with the Republic of Palau was subsequently approved. See 48 U.S.C. §§ 1931, 1932. We shall refer to both as "the Compact" and cite only to the Code provisions pertaining to the first Compact
 
 
 [4]
 The "impact" provisions state in full:
 (1) Statement of Congressional intent
 In approving the Compact, it is not the intent of the Congress to cause any adverse consequences for the United States territories and commonwealths or the State of Hawaii.
 (2) Annual reports and recommendations
 One year after January 14, 1986 and at one year intervals thereafter, the President shall report to the Congress with respect to the impact of the Compact on the United States territories and commonwealths and on the State of Hawaii. Reports submitted pursuant to this paragraph (hereafter in this subsection referred to as "reports") shall identify any adverse consequences resulting from the Compact and shall make recommendations for corrective action to eliminate those consequences. The reports shall pay particular attention to matters relating to trade, taxation, immigration, labor laws, minimum wages, social systems and infrastructure, and environmental regulation. With regard to immigration, the reports shall include statistics concerning the number of persons availing themselves of the rights described in section 141(a) of the Compact during the year covered by each report. With regard to trade, the reports shall include an analysis of the impact on the economy of American Samoa resulting from imports of canned tuna into the United States from the Federated States of Micronesia and the Marshall Islands.
 (3) Other views
 In preparing the reports, the President shall request the views of the Government of the State of Hawaii and the governments of each of the United States territories and commonwealths, the Federated States of Micronesia, the Marshall Islands, and Palau, and shall transmit the full text of any such views to the Congress as part of such reports.
 (4) Commitment of Congress to redress adverse consequences
 The Congress hereby declares that, if any adverse consequences to United States territories and commonwealths or the State of Hawaii result from implementation of the Compact of Free Association, the Congress will act sympathetically and expeditiously to redress those adverse consequences.
 (5) Definition of U.S. territories and commonwealths
 As used in this subsection, the term "United States territories and commonwealths" means the Commonwealth of Puerto Rico, the Virgin Islands, Guam, American Samoa, and the Commonwealth of the Northern Mariana Islands.
 (6) Impact Costs
 There are hereby authorized to be appropriated for fiscal years beginning after September 30, 1985, such sums as may be necessary to cover the costs, if any, incurred by the State of Hawaii, the territories of Guam and American Samoa, and the Commonwealth of the Northern Mariana Islands resulting from any increased demands placed on educational and social services by immigrants from the Marshall Islands and the Federated States of Micronesia.
 49 U.S.C § 1904(e).
 
 
 [5]
 Interior officials provided testimony to Congress regarding Compact impact throughout this period and, as the Declaration of Alan P. Stayman, Deputy Assistant Secretary-Office of Territorial and International Affairs, U.S. Department of Interior indicates, also secured technical assistance grants for Guam and the CNMI to study and address the effect of Compact immigration. Stayman also states that there was no reason to believe that Hawaii suffered any significant impact from Compact immigration during this time
 
 
 [6]
 The Director also submitted § 1904(e)(2) reports to Congress in January 1997 and January 1998
 
 
 [7]
 Hawaii separately suggests that it has standing by virtue of its responsibility for public health and safety, while Guam argues that the normal case or controversy limitations on judicial power should be relaxed because the District Court of Guam is an Article I court and that the people of Guam (including Guerrero) have special third-party standing as disenfranchised United States citizens and pursuant to Article 73(a) of the Charter of the United Nations
 
 
 [8]
 The Court recently summarized the constitutional and prudential limitations on standing in Bennett v. Spear, 520 U.S. 154, 117 S.Ct. 1154, 1160, 137 L.Ed.2d 281 (1997). We do not repeat them, as the parties focus on whether the governments have standing to seek enforcement of a procedural statute under Lujan and we conclude that, even assuming standing to request enforcement of the reporting obligation, judicial review is unavailable for contesting the adequacy of § 1904(e)(2) reports. This means, of course, that the governments' asserted injury from inadequate reports is unredressable
 
 
 [9]
 At most the 99th Congress declared its intent to "act sympathetically and expeditiously to redress" adverse consequences, and authorized sums to be appropriated to cover the costs of any increased demands on educational and social services, but neither statement is binding on future Congresses
 
 
 [10]
 Although the governments did complain about the Director's failure to submit reports between 1989 and 1996, that contention has been mooted. The point addressed by the D.C. Circuit is therefore the only remaining point in contention on appeal
 
 
 [11]
 We are not persuaded that evaluation of § 1904(e)(2) reports should not be left to congressional discretion because Guam and CNMI argue that they lack political representation in Congress. Both have already successfully brought the adverse consequences of Compact immigration to Congress's attention. For example, according to the Director's September 1996 report, Congressional appropriations to both Guam and CNMI for Compact impact in 1995 "represented a response to testimony by representatives of Guam and the CNMI regarding the cost of providing services to Micronesian citizens."