**CENTER FOR BIOLOGICAL DIVERSITY, Bluewater Network, and Sierra Club, Plaintiffs,**

v.

**Spencer ABRAHAM, et al., Defendants.**

**No. 02–00027 WHA.**

United States District Court, N.D. California.

July 30, 2002.

---

Julie A. Teel, James J. Tutchton, Earthjustice Environmental Law Clinic, Denver, CO, for Plaintiffs.

Carole Jeandheur, U.S. Dept. of Justice, Washington, DC, David W. Shapiro, San Francisco, CA, for Defendants.

**ORDER: (1) DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT; AND (2) GRANTING IN PART AND DENYING IN PART PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AND SUMMARY JUDGMENT**

ALSUP, District Judge.

## INTRODUCTION

In this case, plaintiffs, three environmental organizations, seek enforcement of certain provisions of the Energy Policy Act of 1992. These provisions relate to alternative fuel vehicles, or AFVs. Alternative fuel vehicles are vehicles capable of operating on alcohol-based fuels, natural gas, biomass fuels, electricity, and other sources aside from petroleum. Defendants are eighteen government agencies and their heads, all of whom are being sued in their official capacities.[1] Plaintiffs now move for partial summary judgment on Count I of their complaint and summary judgment on Counts II and III. Defendants move for summary judgment as to all of plaintiffs' claims, on the ground that plaintiffs lack the capacity to sue. For the reasons given below, this order **GRANTS** plaintiffs' motion with regard to all of their claims. Plaintiffs have standing to bring each of their claims, and have established beyond doubt that defendants have violated the Act in that (1) several among the defendant agencies have not met the annual AFV-acquisition requirements set forth in the Act (Count I); (2) the defendant agencies have failed to compile and to properly make publicly available the compliance reports required by the Act (Count II); and (3) the Department of Energy has not met the rulemaking deadlines for private and local fleets provided in the Act (Count III). This order grants injunctive and declaratory relief with regard to Counts II and III but only declaratory relief as to Count I.

## STATEMENT

Before addressing the merits, this order must set forth the law at issue here, as

---

1. Defendants, all sued in their official capacity, are the secretaries of Energy; Commerce; Defense; Interior; Veterans Affairs; Transportation; Agriculture; Health and Human Services; Housing and Urban Development; Labor; State; and Treasury; the postmaster general of the U.S. Postal Service; the administrators of the National Aeronautics and Space Administration; the U.S. Environmental Protection Agency; and the General Services Administration; the chair of the U.S. Nuclear Regulatory Commission; and the U.S. attorney general. These agencies are also named as defendants. In papers filed in connection with these motions, plaintiffs have agreed to dismiss the postmaster general and U.S. Postal Service as defendants.

well as the established facts regarding defendants' compliance (or noncompliance) therewith.

## 1. Energy Policy Act.

On October 24, 1992, President George Bush signed the Energy Policy Act of 1992 into law. The Act was designed to create a "comprehensive national energy policy that gradually and steadily increases U.S. energy security in cost-effective and environmentally beneficial ways." H.R.Rep. No. 104–474(I), at 132, *reprinted in* 1992 U.S.C.C.A.N. 1954, 1955. The Act consists of twelve subchapters. Only subchapters one and three, which concern AFVs, are at issue in this case.

### A. AFV–Acquisition Requirements.

The Act includes several measures designed to encourage the wider use of AFVs. This suit concerns certain of these provisions, but not others (such as the Act's requirement that alternative fuel providers themselves purchase AFVs). The provisions at issue here all concern government duties under the Act. *First,* the Act provides that beginning with fiscal year 1996, AFVs had to constitute a certain percentage of each federal fleet's vehicle acquisitions. The percentages mandated by the Act start with 25 percent in 1996 and rise to 33 percent in 1997, 50 percent in 1998, and 75 percent of acquisitions in 1999 and beyond. 42 U.S.C. § 13212(b)(1). A "federal fleet" is defined by the Act as twenty or more light-duty motor vehicles in a metropolitan area with a population of 250,000 or more that are centrally fueled or capable of being centrally fueled and are owned, operated, leased, or otherwise controlled by or assigned to any federal executive department, military department, government corporation, independent establishment, or executive agency, the United States Postal Service, the Congress, the courts of the United States, or the Executive Office of the President. 42 U.S.C. § 13212(b)(3).[2]

Under the Act, "alternative fueled vehicles" need not run solely on alternative fuels. Rather, the term also encompasses "dual fueled vehicles," which are capable of running on alternative fuels or gasoline. 42 U.S.C. § 13211(3), (8)(B). The Act also provides that the Secretary of Energy "may permit a Federal fleet to acquire a smaller percentage than is required ... so long as the aggregate percentage acquired by all Federal fleets is at least equal to the required percentage." 42 U.S.C. § 13212(b)(2).

### B. Compliance Reports.

*Second,* the Act requires each covered federal agency to prepare annual reports to Congress summarizing its compliance with alternative fuel purchasing standards. This compliance-report requirement was added to the Act in November 1998. The first report from each covered agency was due not later than November 13, 1999. The reports must include, *inter alia,* "any information on any failure" to meet statutory requirements; any prior plan of compliance that the agency head was required to submit under Executive Order 13031; and, if that plan of compliance did not contain specific dates by which the federal agency was to achieve compliance, a re-

---

**2.** Certain types of vehicles are excluded from the definition of a fleet, including law enforcement and emergency vehicles, motor vehicles acquired and used for military purposes, and non-road vehicles. 42 U.S.C. § 13212(b)(3)(A)–(F).

vised plan of compliance that contained specific dates for achieving compliance.[3] 42 U.S.C. § 13218(b)(2)(A). These reports must be made available to the public by means including posting on a publicly-available website and announcement of availability in the Federal Register. 42 U.S.C. § 13218(b)(3).

### C. Rulemaking.

*Third,* the Act requires the Department of Energy to undertake a staged rulemaking process to determine whether or not AFV-acquisition requirements also must be applied to private and local fleets in order to meet the Act's goals. DOE is authorized to promulgate a rule under one of two rulemaking schedules. Under the early rulemaking provisions, DOE was to have promulgated a rule by December 15, 1996, for the rule to be enforceable. 42 U.S.C. § 13257(b)(1). If DOE missed this deadline, as was the case, the agency was required to proceed with later rulemaking. 42 U.S.C. § 13257(b)(3).

Under the procedures for later rulemaking, DOE was required to publish an advance notice of proposed rulemaking by April 1, 1998, to evaluate the progress made toward reaching the Act's stated goals of reducing the nation's petroleum motor-fuel consumption by ten percent by the year 2000 and by thirty percent by the year 2010. DOE had to conduct at least three regional hearings and a public comment period on this advance notice of rule-

making. 42 U.S.C. § 13257(c)(1). DOE was required to publish a proposed rule by May 1, 1999, with hearings and public comment to follow. 42 U.S.C. § 13257(d). By January 1, 2000, DOE was required to issue a final determination regarding whether AFV-acquisition requirements applicable to private and municipal fleets were necessary. 42 U.S.C. § 13257(e)(1). A private and municipal fleet program "shall be considered necessary" if DOE determined: (1) the goal of thirty percent replacement fuel by 2010 (an amount and date subject to modification by DOE) is not expected to be achieved without such a program; and (2) the thirty percent goal is practicable and achievable with a private and municipal fleet requirement program in combination with voluntary means and other programs. 42 U.S.C. § 13257(e)(1)(A)–(B).

If DOE determined that a private and municipal fleet requirement program was not necessary, it was required to publish this determination not later than January 1, 2000, in the Federal Register as final agency action, including an explanation of its and a basis for its determination. 42 U.S.C. § 13257(f)(2). If DOE determined that a private and municipal fleet requirement program was necessary, then it was required to issue a rule by January 1, 2000, requiring a percentage of the total number of new light-duty motor vehicles acquired for a fleet (other than a fleet owned by a federal, state, or covered alternative fuel provider) to be AFVs beginning

---

**3.** President Clinton signed Executive Order 13031 on December 13, 1996. 61 Fed.Reg. 66529 (1996). This order commanded agency heads to submit reports concerning their compliance with 42 U.S.C. § 13212(b)(1), including a plan for bringing their agency into compliance with that section (if necessary). *Ibid.* Executive Order 13031 was revoked by Executive Order 13149, issued April 21, 2000.

65 Fed.Reg. 24607 (2000). In pertinent part, Executive Order 13149 provides, "Each agency shall fulfill the acquisition requirements for AFVs established by section 303 of the Energy Policy Act of 1992." *Ibid.* Both executive orders noted that they were not intended to create any enforceable rights. 61 Fed.Reg. 66529, 66531; 65 Fed.Reg. 24607, 24610.

in model year 2002 (or later). 42 U.S.C. § 13257(g)(1).

## 2. Compliance.

The parties agree that, for the most part, the government has failed to live up to its duties under the Act.

### A. AFV–Acquisition Requirements.

Despite their FOIA requests, plaintiffs have not received purchasing data from all defendant agencies. From the record, one cannot tell whether plaintiffs have sought information pertaining to certain other government entities (many immune from suit under the APA), such as Congress or the courts. Plaintiffs' information indicates that at least fifteen of the eighteen defendants have fallen short of the AFV-acquisition requirements at least one year between 1996 and 2001. By its own account, between 1996 and 2001 the Department of Defense acquired 9353 fewer AFVs than required. On the other end of the spectrum is the United States Postal Service, which between 1996 and 2001 acquired approximately 8000 *more* AFVs than required. All other identified government agencies fall in between, or have not provided plaintiffs (or the public) with data. Several government agencies report modest progression toward meeting the Act's percentage requirements, though their deficits often remain large. For example, the Department of Defense and Department of Agriculture are two agencies reporting data for 1996 through 2001:

**AFVs as a Percentage of Overall Acquisitions**

| | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 |
|---|---|---|---|---|---|---|
| Department of Defense | 21 | 24 | 33 | 36 | 47 | 57 |
| Department of Agriculture | 4 | 18 | 34 | 34 | 41 | 76 |

The following table lists all deficiencies vis-a-vis the statutory minimum that have been stipulated to by the parties:

**AFVs Below Statutory Requirement**

| | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 |
|---|---|---|---|---|---|---|
| Department of Commerce | 2 | | 127 | 227 | 76 | |
| Department of Defense | 279 | 722 | 1184 | 3056 | 2233 | 1879 |
| Department of Interior | | 47 | | | 335 | |
| U.S. General Services Administration | 4 | | | | | |
| Department of Veterans Affairs | | | | | 662 | |
| Department of Transportation | 11 | 56 | 65 | 133 | 386 | |
| Nuclear Regulatory Commission | 2 | | 1 | | | |
| Environmental Protection Agency | | 35 | 23 | 17 | | |
| Department of Agriculture | 641 | 108 | 165 | 195 | 287 | |

| | | | | | |
|---|---|---|---|---|---|
| Department of Health and Human Services | 2 | | | 73 | 17 |
| Department of Housing and Urban Development | | 1 | 1 | | |
| Department of Justice | | | 1 | | 54 |
| Department of Labor | | | | 18 | |
| Department of State | | 14 | | | |
| National Aeronautical and Space Administration | | | | | 2 |

\* \* \* \* \* \*

This chart does not provide figures for years where the agencies met their obligations or provided no data. Several agencies report that they complied with their obligations in certain years. Plaintiffs assert that some of these reports are inaccurate, but in their motion for partial summary judgment seek declaratory and injunctive relief based at least on the violations they have already identified and which were set forth in the table above.

## · B. Compliance Reports.

As for the publication of compliance reports, the parties have stipulated that none of the government agencies named as defendants have met all the statutory requirements of producing annual reports for 1999, 2000 and 2001; posting the reports on publicly-available websites; and announcing their availability in the Federal Register. Indeed, the parties agree that none of the defendants has posted notice in the Federal Register as to *any* report. With regard to one defendant, however, this stipulation is inaccurate. On June 10, 2002, the Department of Justice announced in the Federal Register that its annual reports were available at the Department's Internet site. 67 Fed.Reg. 39743 (2002). At the July 11 hearing on these motions, the Court requested that the government submit a statement regarding which agencies have filed compliance reports. In response, counsel for the government submitted an unsworn statement which indicated that most agencies had prepared at least some compliance reports (or had taken steps toward preparing these reports), though these reports had not been made available to the public in the manner required by statute.

## C. Rulemaking.

On August 7, 1996, DOE published an advance notice of proposed rulemaking to determine whether a private and municipal fleet AFV requirement was necessary. 61 Fed.Reg. 41032 (1996). DOE held three regional hearings in Dallas, Sacramento, and Washington, D.C., and · invited the public to express oral views, data and arguments on the proposed rulemaking, and submit written comments. *Ibid.* DOE terminated this rulemaking. 62 Fed.Reg. 19701 (1997). Then, on April 17, 1998, DOE published an advance notice of proposed rulemaking and notice of public hearings to determine whether a private and municipal fleet AFV requirement was necessary. 63 Fed.Reg. 19372 (1998). DOE held public hearings in Los Angeles, Minneapolis, and Washington, D.C. *Ibid.*

DOE extended the January 1, 2000, deadline for issuing a rule or a determination that no rule was needed by ninety days. 65 Fed.Reg. 1831 (2000). It did not meet the revised deadline. On July 20, 2000, DOE announced in the Federal Register that it was "pausing its rulemaking efforts regarding whether and what to propose as regulatory requirements on local government and private fleets with respect to alternative fueled vehicles until after consultations with State and local government officials have occurred." 65 Fed.Reg. 44987, 44988 (2000). On November 30, 2000, DOE promulgated a tentative revised timetable for complying with the rulemaking deadlines; (1) it would meet the May 1, 1999, proposed rule deadline by May 2001; and (2) it would meet the January 1, 2000, final determination deadline by January 2002. 65 Fed.Reg. 73763, 73764 (2000). These deadlines were not met.

\* \* \* \* \* \*

In January 2002, plaintiffs filed a complaint in this court attacking defendants' failure to comply with the Act's AFV-acquisition and compliance-report requirements and DOE's failure to meet the statutory rulemaking deadlines. Plaintiffs promptly moved for partial summary judgment on their claim that defendants have violated the AFV-acquisition requirements, and summary judgment on their claims regarding the failure to produce and make available compliance reports and to meet the rulemaking deadlines. As stated, plaintiffs' motion for summary judgment as to their first claim is partial in the sense that they seek judgment only on those purchasing deficiencies that they have already identified.

Defendants countered with their own motion for summary judgment. Defendants assert that plaintiffs lack standing to sue (as to any claim) because they do not identify any concrete and particularized injuries caused by the government's conduct and redressable through judicial intervention. Furthermore, defendants say plaintiffs lack the ability to proceed under the Administrative Procedure Act. Finally, defendants argue that even if plaintiffs have standing and a cause of action, the injunctive relief plaintiffs seek should nevertheless be denied.

## ANALYSIS

Both plaintiffs and defendants request summary judgment. A moving party without the ultimate burden of persuasion at trial has both the initial burden of production and the ultimate burden of persuasion on a motion for summary judgment. In order to carry its burden of production, the moving party must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial. In order to carry its ultimate burden of persuasion on the motion, the moving party must persuade the court that there is no genuine issue of material fact. *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir.2000). Where a party with the burden of persuasion at trial moves for summary judgment, that party must make a showing sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party. *Calderone v. United States*, 799 F.2d 254, 259 (6th Cir. 1986). In such a case, the moving party "must establish beyond peradventure *all* of the essential elements of its claim or defense to warrant judgment in [its] favor."

*Fontenot v. Upjohn Co.,* 780 F.2d 1190, 1194 (5th Cir.1986) (emphasis original).

\*　\*　\*　\*　\*　\*

The principal issue raised concerns plaintiffs' ability to sue. The government argues that plaintiffs cannot meet any of the traditional standing requirements. Plaintiffs, naturally, disagree.

 The general rules regarding Article III standing are well-fixed. To satisfy the standing requirements imposed by the Constitution, a plaintiff must show that (1) it has suffered an injury in fact that is concrete, particularized, and actual or imminent; (2) the injury is fairly traceable to the challenged action of the defendant(s); and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision. *Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.,* 528 U.S. 167, 180–181, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000). An association has standing to bring suit on behalf of its members when its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit. *Id.* at 181, 120 S.Ct. 693.[4] The party with the burden of proving standing bears the responsibility of supporting its allegations as to each element with the level of proof required at each stage of the proceedings. *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992).

 Standing must be evaluated claim-by-claim, a plaintiff may have standing to challenge some sections of a statute, but not others. A plaintiff may also have standing to seek specific types of relief, but not others. *Clark v. City of Lakewood,* 259 F.3d 996, 1006 (9th Cir.2001). This order will evaluate plaintiffs' assertions regarding Article III standing and the availability of judicial review and relief under the APA as they relate to each claim and type of relief sought.

### 1.　AFV–Acquisition Requirements.

The first question concerns plaintiffs' standing to challenge defendants' asserted violations of the AFV-acquisition requirements. Toward this point, plaintiffs have submitted declarations from members of the Center for Biological Diversity (Peter Galvin), the Bluewater Network (Elisa Lynch, Teri Shore and Sean Smith), and the Sierra Club (Kevin Finney).

#### A.　Standing.

##### (1).　Injury.

 The asserted injuries relevant to plaintiffs' first claim can be coarsely grouped into six categories: (1) concerns regarding the adverse health effects of smog and air pollution caused by vehicle emissions (attested to by Finney, Galvin, Lynch, Shore, Smith); (2) concerns about and assertions regarding global warming (Galvin, Lynch, Shore, Smith); (3) traffic complaints (Shore); (4) concerns regarding compounded pressure to engage in oil exploration and development in sensitive wildlife areas in the U.S. "that are important to me" (Galvin); (5) aesthetic injuries (Lynch, Shore, Smith); and (6) frustration of a stated desire to purchase a AFV (Finney, Galvin).

---

**4.** The second and third prongs of associational standing are not disputed here; at issue is whether the underlying members themselves have standing.

Some of these injuries do not suffice to provide standing. Plaintiffs do not make clear how traffic problems would be eased by an injunction that would require defendants to buy cars running on alternative fuels rather than gasoline. The concerns presented regarding global warming are too general, too unsubstantiated, too unlikely to be caused by defendants' conduct, and/or too unlikely to be redressed by the relief sought to confer standing. *See Allen v. Wright,* 468 U.S. 737, 759, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984); *Sierra Club v. Morton,* 405 U.S. 727, 734–35, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972). Galvin's claim regarding the threat oil exploration poses to areas "important to him" is impermissibly vague at this stage of the proceedings. *See Lujan v. Nat'l Wildlife Fed.,* 497 U.S. 871, 889, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990). Likewise, his asserted desire (like Finney's) to purchase an affordable AFV is too vague and noncommittal (Galvin says he "would hope" to buy an AFV in the future; Finney "would very much like to purchase an alternative fuel car of some type in the future") to confer standing. *See Defenders of Wildlife,* 504 U.S. at 564, 112 S.Ct. 2130 ("some day" intentions not enough to provide standing); *Allen,* 468 U.S. at 759, 104 S.Ct. 3315.

This leaves plaintiffs' claims regarding aesthetic injuries and the adverse health effects of smog and air pollution caused, if only in small part, by defendants' conduct. The parties agree that, according to the United States Environmental Protection Agency, vehicles running on gasoline emit "criteria" pollutants that can lead to health problems and reduced visibility. The Ninth Circuit has held that being "compelled to breathe air less pure than that mandated by the Clean Air Act" constitutes an injury sufficient to support standing. *NRDC v. U.S.E.P.A.,* 507 F.2d 905, 910 (9th Cir.1974). It is also established that aesthetic injuries are cognizable for standing purposes. *See Cantrell v. City of Long Beach,* 241 F.3d 674, 681 (9th Cir.2001). So long as they are concrete and particularized, these injuries are sufficient even if many people suffer them. *See Sierra Club,* 405 U.S. at 734, 92 S.Ct. 1361. Even though a few of the individual declarants' statements are framed in subjective terms (*e.g.,* in terms of "concerns" regarding pollution's effects on them), others are not; and given their personal contact with air pollution the concerns are reasonable and sufficient to show an injury. *See Laidlaw,* 528 U.S. at 184–85, 120 S.Ct. 693 ("reasonable concerns" regarding nearby pollution discharge affecting recreational and aesthetic interests suffice as an injury).

Defendants rely on *Ecological Rights Found. v. Pac. Lumber Co.,* 230 F.3d 1141 (9th Cir.2000), for the proposition that the declarants must show a more concrete "connection to the area of concern." *Id.* at 1149. Yet the declarants here satisfy the standard identified by the Ninth Circuit; they state that air pollution caused by vehicle emissions personally and concretely affects them where they work, live and/or recreate.

### (2) Causation and Redressability.

A more troubling issue concerns whether the declarants' injuries were caused by defendants' conduct and can be redressed through the relief plaintiffs seek. Plaintiffs need not establish causation, of course, with the degree of certainty that would be required for them to succeed on the merits of a tort claim. *Hall v. Norton,* 266 F.3d 969, 977 (9th

Cir.2001). And although none of the declarants say that their injuries are caused solely by defendants' conduct, such allegations are not required in cases where pollution is commingled. *See Pub. Int. Research Group of New Jersey, Inc. v. Powell Duffryn Terminals, Inc.*, 913 F.2d 64, 73 (3d Cir.1990) (holding that to have standing plaintiffs must only show that the injunctive relief requested would "decrease" pollution, not that it would return a polluted waterway to "pristine condition"). Yet plaintiffs still must establish a "reasonable probability" that the challenged action threatens their concrete interest. *Hall*, 266 F.3d at 977.

 Neither the declarants nor any other evidence in the record specifies precisely which among the more than dozen defendant agencies, if any, are causing the declarants' injuries. Only two of the declarants assert that they are in the same metropolitan area as *any* government vehicles, much less government vehicles forming part of a noncompliant fleet. Galvin states, "I am aware that there are large federal fleets covered by the Act in the Bay Area. I believe that the failure of the federal government to purchase the required percent of AFVs has resulted in higher concentrations of pollutants in the San Francisco Bay Area" (Galvin Decl. at ¶ 9). Finney says, "*Many* of the named defendants in this lawsuit are federal agencies maintaining vehicle fleets in the greater Los Angeles area" (Finney Decl. at ¶ 6) (emphasis added). These declarations completely fail to address the important issue of *which* defendant caused or contributed to the asserted injuries. This is ameliorated but little by the first amended complaint's (uncontested) allegations that many defendants operate fleet vehicles in San Francisco and that each of the defendant agencies maintains offices in San Francisco County.

Under other circumstances, this failure of proof would be fatal, at least as to this cause of action. Plaintiffs, however, also argue that the purchase of more alternative fuel vehicles by the government would catalyze the *private* market for these vehicles. In other words, the government's failure to purchase the required number of AFVs is stifling, or at least failing to encourage, the private market for AFVs. This argument is not just a flight of plaintiffs' fancy. According to the House Report on the Act, the acquisition requirements were intended to "establish the Federal government as a market leader." H.R.Rep. No. 104–474(I), at 136–37, *reprinted in* 1992 U.S.C.C.A.N. 1954, 1960. Compelling AFV purchases would, in the words of Senator Johnston, "solve the chicken-and-the-egg proposition with respect to alternative fuels." 138 Cong.Rec. S17568. Nor does this theory rely on so much speculation regarding third parties' actions as to defeat standing. For example, in an analogous situation, *Center for Auto Safety v. Nat'l Highway Traffic Safety Admin.*, 793 F.2d 1322 (D.C.Cir.1986), held that certain petitioners could challenge the NHTSA's failure to adopt higher fuel-economy standards. There, the petitioners asserted that the NHTSA's failure to adopt higher standards was frustrating their ability to purchase affordable fuel-efficient vehicles. Although it was arguably speculative that automakers would respond to higher standards with more fuel-efficient vehicles (rather than pay fines for non-compliance), *Center for Auto Safety* held that the petitioners claiming this injury had standing. Noting the close relationship between the challenged government action and the outcome sought by the petitioners, it held, "The object of the

agency's regulation and the injury are ... directly linked." *Id.* at 1334.

Similarly here, the very purpose of the AFV-acquisition requirements was to encourage the development of a mass market for AFVs. If the government were to purchase more AFVs, the theory went, it would provide a foundation upon which a private market would grow. Manufacturers could count on the baseline demand provided by government purchases, and would invest in plant and equipment. Consumers would see the benefits of AFVs in action. It would seem to follow that if the government did not purchase as many AFVs as required, the private market for these vehicles would not grow as much. This case does not involve the sort of tenuous concatenations of "ifs" that have characterized claims where causation has been found lacking. Instead, it seems reasonably likely that if defendants were to fulfill their AFV requirements, the injuries alleged by plaintiffs would be lessened not only because of reduced pollution from government vehicles but also because the much larger private market would follow the government's lead, at least to a degree. Given this, plaintiffs have standing. This order therefore turns to defendants' argument regarding the unavailability of judicial review under the APA.

### B. Administrative Procedure Act.

With their AFV-acquisition claim, as with their other counts, plaintiffs proceed under the APA because, by their own admission, the Energy Policy Act does not provide them with a cause of action. The APA, on the other hand, states, "A person suffering a legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." 5 U.S.C. § 702. Agency action is defined as including the "whole or part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." 5 U.S.C. § 551(13). The reviewing court "shall ... compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706. The APA applies except to the extent that a statute precludes judicial review, or agency action is committed to agency discretion by law. 5 U.S.C. § 701(a).

To demonstrate standing under the APA, a plaintiff must (1) identify a "final" agency action; and (2) show that the injury complained of falls within the "zone of interests" sought to be protected by the statutory provision whose violation forms the basis of the complaint. *ONRC Action v. Bureau of Land Mgmt.*, 150 F.3d 1132, 1135 (9th Cir.1998). For an action to be "final" under the APA, it should (1) mark the conclusion of the agency's decision-making process; and (2) be an action by which rights or obligations have been determined or from which legal consequences flow. *Bennett v. Spear*, 520 U.S. 154, 177, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997). Review of an agency's failure to act has been referred to as an exception to the final agency action requirement; yet courts are inhospitable to claims of a "failure to act" that are, in truth, merely "complaints about the sufficiency of an agency's action 'dressed up as an agency's failure to act.'" *Ecology Center, Inc. v. U.S. Forest Serv.*, 192 F.3d 922, 926 (9th Cir.1999), quoting *Nevada v. Watkins*, 939 F.2d 710, 714 n. 11 (9th Cir.1991)

Plaintiffs satisfy the "zone of interests" test. The standard here is whether the "interest sought to be protected by the complainant is arguably within

the zone of interests to be protected ... by the statute." *Nat'l Credit Union Admin. v. First Nat'l Bank & Trust Co.*, 522 U.S. 479, 492, 118 S.Ct. 927, 140 L.Ed.2d 1 (1998), quoting *Ass'n of Data Processing Serv. Orgs. v. Camp*, 397 U.S. 150, 153, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970). The reviewing court is to first discern the interests arguably to be protected by the statutory provision at issue, and then inquire whether the plaintiff's interests affected by the agency action in question are among them. *First Nat'l Bank & Trust Co.*, 522 U.S. at 492, 118 S.Ct. 927. The House Report on the Energy Policy Act set forth the purposes of the law:

The bill seeks to reduce the costly, impending rise in U.S. oil imports; to conserve energy and use it more efficiently; to reduce our use of oil-based fuels in our motor-vehicle sector; to increase competition in the electricity, natural gas, coal, renewable energy, and oil markets in order to provide new energy options and more diverse supplies; to increase the strategic oil reserves that shield us from another world oil disruption; to implement solutions to our nuclear waste and uranium enrichment problems; and to address greenhouse warming.

H.R. No. 102–474(I), at 132, *reprinted in* 1992 U.S.C.C.A.N. 1954, 1955. The specific motive behind the alternative-fuels provisions is murkier. The primary stated purpose for the alternative-fuels sections of the statute was to reduce our reliance on oil imports. *See id.* at 1959–60. The House Report also provided, however, as follows (emphasis added):

Concurrent with this renewed focus on the importance of energy to the economy came a growing awareness of the direct link between the level and type of energy consumption and the quality of the environment. The [House Energy and Commerce] Committee sought, in addition to improved energy efficiency, a commitment to develop renewable energy, *to promote cleaner alternative automotive fuels*, to burn coal more efficiently and cleanly, and to accelerate the process of characterizing a site for the disposal of high-level nuclear waste.

*Id.* at 1955. The reference to "cleaner" alternative fuels indicates that the plaintiffs' interest in cleaner air was arguably among the interests the alternative-fuel provisions sought to protect, and this order so holds.

■■■ The more difficult question concerns whether plaintiffs' purchasing claim attacks a final "agency action" or a genuine "failure to act." Although it is a close call, this order holds that past violations are subject to review as final actions. Plaintiffs' "failure to act" argument is a tenuous one when directed toward the agencies' fleet purchases because defendants *have* acted. Plaintiffs simply argue they have not done enough. This does not amount to a "failure to act." *See Ecology Center*, 192 F.3d at 926. Plaintiffs' better argument is that the agencies' failure to comply with the fleet-purchasing requirements for 1996–2001 constitutes "final agency action." In addressing total acquisitions for years gone by, plaintiffs focus on a "completed universe of particular" decisions, which, unlike an overall "program," may be reviewed under the APA *National Wildlife Federation*, 497 U.S. at 890, 110 S.Ct. 3177. It is undisputed that the defendant agencies failed to acquire as many AFVs as they were required to in fiscal years 1996–2001, at least to the extent set forth earlier. The decisions not to make the required acquisitions are plainly

"final" in the sense they cannot be revisited; each agency acquired as many AFVs in these years as they are ever going to buy. Moreover, as discussed earlier, plaintiffs have stated concrete injuries attributable to defendants' conduct.

The situation here is somewhat comparable to that in *San Juan Audubon Soc. v. Veneman*, 153 F.Supp.2d 1 (D.D.C.2001). In *San Juan*, a coalition of environmental groups brought an action under the APA against, among others, the Department of Agriculture. The plaintiffs alleged that the defendants' use of a sodium-cyanide ejectors program in a general area violated the Environmental Protection Act. Defendants moved to dismiss on grounds including the absence of an identifiable "agency action" under the APA. Specifically, the defendants there (as they do here) alleged that the plaintiffs were demanding " 'a general judicial review of [an agency's] day-to-day operations.' " *San Juan*, 153 F.Supp.2d at 5, quoting *Lujan*, 497 U.S. at 899, 110 S.Ct. 3177. *San Juan* rejected this argument. It noted that, unlike the situation in *Lujan*, the plaintiffs before it were not asking the court to review the program's merits as a matter of policy. Rather, the plaintiffs' claim was limited to defendants' use of cyanide ejectors in certain areas.[5] As indicated by *San Juan*, a properly discrete and concrete challenge to a final agency activity can be brought under the APA. Although plaintiffs' challenge to alleged ongoing and feared future violations of the AFV-acquisition requirements may be vulnerable to charges of unripeness, or as attempts to monitor agencies' "day-to-day operations," review of the past (1996–2001) violations poses no such issue or intrusion.

\* \* \* \* \* \*

All this said, the ultimate issue concerns whether plaintiffs should, or must, receive the relief they seek. Declaratory relief is proper. It is acknowledged, by all that certain defendants have violated the acquisition requirements in the manner and to the extent discussed in this order's statement of facts.[6] Injunctive relief poses a more nettlesome question. Even conceding they have violated the law, defendants urge the Court to not impose an injunctive remedy. The APA provides that a court "shall" compel unlawfully withheld agency action. 5 U.S.C. § 706. Likewise, 42 U.S.C § 13212(b)(1) imposes a mandatory duty on agencies to meet their fleet minimums, absent a waiver. The parties point to conflicting decisions from other circuits regarding a court's discretion not to compel agency action in similar circumstances. *Compare Forest Guardians v. Babbitt*, 174 F.3d 1178, 1190 (10th Cir.1999) (where statute requires action by a date certain and plaintiffs proceed under APA § 706, courts lack discretion not to issue injunctive relief), *with In re Barr Labs., Inc.*, 930 F.2d 72, 74 (D.C.Cir.1991) (courts maintain discretion not to compel action even where deadlines are mandatory).

The Ninth Circuit has recently spoken on this very issue. In *Biodiversity Legal*

---

5. *San Juan* also distinguished *Lujan* as a summary-judgment case, whereas the motion before it was a motion to dismiss. *Id.* at 5. Although the matter at hand here is poised at summary judgment, this order holds that plaintiffs have identified sufficiently particularized agency actions.

6. The Court is concerned that later on, successive rounds of declaratory relief would degenerate into a morass of innumerable factual disputes and become unmanageable. At this threshold, however, these manageability problems are not presented and it is clear that defendants are in violation of the Act at least to the extent to which they have stipulated.

*Found. v. Badgley,* 284 F.3d 1046 (9th Cir.2002), the plaintiff environmental organizations sued the government for failure to comply with deadlines imposed by the Endangered Species Act for making a finding regarding whether to list a species as endangered or threatened. One question on appeal was whether the district court had discretion to refrain from granting injunctive relief requiring a prompt listing determination. *Biodiversity Legal Foundation* first determined that application of the so-called "TRAC" factors (after *Telecommunications Research & Action Ctr. v. FCC,* 750 F.2d 70, 80 (D.C.Cir. 1984)) was inappropriate where Congress had set specific mandatory deadlines for agency action. *Id.* at 1056, n. 10. Second, after noting that "a statutory violation does not always lead to the automatic issuance of an injunction," *Biodiversity Legal Foundation* held that "when federal statutes are violated, the test for determining if equitable relief is appropriate is whether an injunction is necessary to effectuate the congressional purpose behind the statute." *Id.* at 1056–57. Then, *Biodiversity Legal Foundation* looked to the Endangered Species Act to determine whether equitable relief was proper.

▮ The question here thus becomes whether an injunction requiring defendants to come into compliance, or to offset past deficiencies in future purchases, would effectuate the purposes behind the Act. The answer is no. There are several reasons why. *First,* the statute itself makes the Secretary of Energy, if anyone, the primary official responsible for enforcing or excusing deviations from the acquisition requirements. Immediately after Section 13212(b)(1)'s establishment of these requirements, Section 13212(b)(2) provides this important caveat:

The Secretary, in consultation with the Administrator of General Services where appropriate, may permit a Federal fleet to acquire a smaller percentage than is required in paragraph (1), so long as the aggregate percentage acquired by all Federal fleets is at least equal to the required percentage.

This waiver authority is just one of several manifestations in the Act of Congress's intent (mirrored in Executive Orders 13031 and 13149) not to punish noncompliance with a stiff injunction. Likewise, Section 13218(b)(2)(A)(ii)(II), added to the Act in November 1998, provides that each agency shall issue annual reports regarding agency purchases "that contain specific dates for achieving compliance," without any indication that agencies would be subject to supervision for shortfalls. A court order dictating compliance along plaintiffs' and the court's timetables would be inconsistent with Congress' apparent desire to allow agencies to improve on their own. *Cf. Guerrero v. Clinton,* 157 F.3d 1190, 1193–94 (9th Cir.1998).

*Second* and more fundamentally, the Act's purposes would be extremely ill-served by funneling government purchasing decisions through a court. Whatever Congress intended with the Act, it certainly did *not* intend for a court to become the *de facto* vehicle purchasing agent for the federal government. Should plaintiffs receive the injunction(s) they seek, countless fact-intensive disputes would inevitably follow, Indeed, even at this early stage plaintiffs challenge the accuracy of many of the figures defendants have provided. The terms and exclusions in Section 13212 are fertile soil from which will grow a bumper crop of factual disputes conceivably concerning each and every car in the federal fleet. For example, when is a vehicle

"held for lease or rental to the general public," a "law enforcement vehicle," or a "nonroad vehicle" (all exclusions in Section 13212(b)(3))? What if DOE exercises its "pardon power"—would there need to be further evidentiary hearings to determine the entire aegis of Section 13212 (*i.e.*, each and every agency or entity forming the entire federal fleet, and exactly how many "covered vehicles" each had at all relevant times)? In short, an injunction requiring compliance or set-offs for past deficiencies would degenerate into an unmanageable farce.

Nor would an injunction be proper, given the scope of the relief sought relative to the injuries claimed. Plaintiffs seek massive injunctive relief that would go well beyond their asserted injuries. This sort of sweeping, inexpert control over purchasing decisions cannot be what Congress wanted. The APA also does not allow such a disproportionate remedy. The judicial-review provision of the APA provides, "Nothing herein (1) affects other limitations on judicial review or the power or the duty of the court to dismiss any action or deny relief on any appropriate legal or equitable ground." 5 U.S.C. § 702. The injunctive remedies plaintiffs seek would be improper uses of the equity power.

### C. Conclusion.

Plaintiffs' request for partial summary judgment on their first claim is **GRANT-ED**. As indicated above, plaintiffs have standing to sue and are entitled a declaratory judgment finding that certain among the defendant agencies did not comply with the AFV-acquisition requirements in the manner and to the extent outlined above. Plaintiffs' request for injunctive relief, however, is **DENIED**. Such relief would detract from, rather than serve, the Act's purposes.

### 2. Compliance Reports.

 Plaintiffs' second claim (Count II) concerns defendants' failure to prepare the required compliance reports for 1999, 2000 and 2001; to post these reports on their websites; and to announce the availability of these reports in the Federal Register. One of the declarants (Galvin) says that this has hindered him in his environmental-education efforts; two others (Lynch and Smith) say that this information would be "useful" to them in their jobs. Although Lynch's and Smith's declarations are not as specific as would be ideal, these constitute sufficient injuries for standing purposes. *Federal Election Comm'n v. Akins,* 524 U.S. 11, 24–25, 118 S.Ct. 1777, 141 L.Ed.2d 10 (1998).

Defendants assert that there has been no injury because plaintiffs have managed to obtain "most" of the information required in the compliance reports through Freedom of Information Act requests. This argument ignores two basic facts: (1) "most" is not the same as "all"; and (2) the whole point of making material available on the Internet is to avoid the wasted time and expense involved with laborious FOIA requests. *Cf. Fiduccia v. Dep't of Justice,* 185 F.3d 1035, 1041 (9th Cir.1999) (discussing the delays concomitant with FOIA inquiries). Indeed, anyone questioning the value of Internet posting would do well to peruse the declaration of plaintiffs' counsel, who has expended great effort to gather the relevant facts. Causation and redressability, meanwhile, are clear and not seriously disputed.

 With regard to the APA, the interest stated by plaintiffs arguably falls within the "zone of interests" sought to be protected by Section 13218. Promulgation of such reports would indicate the govern-

ment's progress toward its AFV-acquisition requirements, which in turn would be helpful information to those who seek cleaner air. The tougher question is whether the failure to promulgate reports constitutes a "final action" or a "failure to act." Plaintiffs rely on the "failure to act" exception to the final-action requirement here (Opp.21). As discussed, courts are reluctant to recognize a "failure to act" claim where plaintiffs are in fact merely attacking an *inadequate* response. Had defendants shown significant indicia of compliance with Section 13218—*i.e.*, posting and announcing the availability of reports for some years, but not others; presenting actual copies of the reports they say have been prepared, but which have not as yet been posted because of compelling extenuating circumstances; *etc.*—plaintiffs' "failure to act" claim would fail as nothing more than a dressed-up challenge to the sufficiency of defendants' compliance with the Act. *See Ecology Center,* 192 F.3d at 926 (holding that the Forest Service's failure to produce two fewer than the total number of annual reports required by law was not a "failure to act," since "[t]he record demonstrates that the Forest Service performed extensive monitoring and provided detailed reports. . . . The Forest Service merely failed to conduct its duty in strict conformance with the Plan and NFMA Regulations"). But defendants have not made any such evidentiary showing. Regardless whether

"reports" of some sort have been repaired, the undisputed facts in the record here reflect a genuine failure to make the reports available and accessible to the public in the manner required by Congress. The Act provides that the first reports were to have been provided to Congress no later than November 13, 1999. Although the Act sets no specific deadline for website posting and announcement of the reports' availability, according to the parties' stipulation and the Court's own research, as of this time—almost three years after the first report was to have been given to Congress—only one agency (the Department of Justice) has done both with regard to *any* report.[7] This delay is sufficiently grave to support a conclusion that the agencies have unlawfully withheld action required of them by law.[8]

 Declaratory relief is once again proper. To the extent identified by the parties and confirmed by this order, defendants have not met their reporting obligations under 42 U.S.C. § 13218(b). As for injunctive relief, here as well defendants urge the Court to not impose an injunction. And, once again, the question becomes whether such relief would be consistent with the underlying purposes of the Act. Here, the answer is yes. Requiring the preparation of compliance reports and making these reports available to the public would serve the statute's interest in developing the private AFV market. It

7. The parties have stipulated that the Departments of Defense and Energy have posted certain compliance reports on their websites, but have not published notice of this fact in the Federal Register.

8. This does not violate the principle that reporting-to-Congress obligations are not judicially reviewable. *Guerrero,* 157 F.3d at 1194–96; *Natural Resources Defense Council, Inc. v. Hodel,* 865 F.2d 288, 316–19 (D.C.Cir. 1988). As *Hodel* provided, "a reporting-to-

Congress obligation is entirely different than a congressionally imposed requirement that an Executive Branch department or agency gather information and make that information, upon compilation, publicly available." 865 F.2d at 317, n. 30. Section 13218(b)(3) explicitly requires that the reports produced by covered agencies be made available to the public.

would provide additional information regarding defendants' AFV utilization and how defendants plan on increasing their AFV use in the future (to the extent they are not already in compliance). It is difficult to imagine any significant countervailing considerations that would counsel against properly-framed injunctive relief. The labyrinthine legal and factual issues concomitant with the AFV-acquisition requirements are absent here.

Therefore, it is **ORDERED** that defendants shall prepare all overdue reports not later than **November 26, 2002.** This four-month window is intended to allow the agencies time to gather the required information and produce reports comporting in full with the standards set forth in 42 U.S.C. § 13218(b). Within a reasonable time after preparing these reports, and not in any event later than **January 31, 2003,** each agency shall place these reports on a publicly-available website on the Internet. Not later than **January 31, 2003,** each agency also shall publish the availability of its reports, including the publicly-available Internet website address, in the Federal Register. Defendants shall file and serve a status report indicating what progress has been made toward compliance with this portion of the order not later than **September 12, 2002.** Plaintiffs may file and serve a reply not later than **September 19, 2002.** The matter will be taken up at the hearing scheduled for **September 26, 2002,** discussed in more detail below.

### 3. Regulatory Delay.

Plaintiffs' final claim (Count III) concerns DOE's delay in issuing regulations covering private and local fleets. DOE admits it has not met the statutory deadlines. It argues, however, that it should be given additional time to comply.

 Once again, this order revisits the standing issue. A plaintiff can enforce procedural rights so long as the procedures in question are designed to protect some threatened concrete interest of his that is the ultimate basis of standing. *Defenders of Wildlife,* 504 U.S. at 573, n. 8, 112 S.Ct. 2130. Here, plaintiffs' grounds for standing are: (1) the fact that the air-pollution standards would affect federal and local fleets in the vicinity of the declarants, which in turn would reduce air pollution in a manner affecting the declarants; and (2) the fact that three of the declarants (Galvin, Lynch, and Smith) say that they have lost an opportunity to participate and comment in the rulemaking process. The declarants' asserted environmental and health-related injuries caused by air pollution, as discussed earlier, are cognizable. Although they have failed to allege that they are in any way proximate to any private or local fleets, it is beyond doubt that nearby private and local fleets contribute to the declarants' injuries, and that these injuries could be redressed by rulemaking. The outcome of rulemaking may be uncertain, but "in the case of a plaintiff" seeking to enforce a procedural requirement the disregard of which could impair a separate concrete interest of theirs,' the plaintiff can establish standing 'without meeting all the normal standards for redressability and immediacy.'" *Hall,* 266 F.3d at 975, quoting *Defenders of Wildlife,* 504 U.S. at 572, n. 7, 112 S.Ct. 2130.

 Plaintiffs can also proceed under the APA. DOE's failure to comply with the mandatory statutory deadlines constitutes a "failure to act" enforceable through the APA. *See Forest Guardians,* 174 F.3d at 1190. And for the reasons discussed earlier in this order, the interest in cleaner air

plaintiffs seek to enforce falls within the statute's zone of interests.

Given that plaintiffs have standing, and DOE has admittedly not complied with the mandatory rulemaking schedule, declaratory relief is again proper. The question returns to whether injunctive relief is "necessary to effectuate the congressional purpose behind the statute." *Biodiversity Legal Found.*, 284 F.3d at 1056–57. As discussed, the Act's legislative history suggests the importance of enhanced alternative fuel use, which could be served by prompt rulemaking. DOE asserts that its delay is justified and should be excused because "[c]urrently DOE is meeting with state and local officials regarding whether and what to propose as regulatory requirements on local and government fleets" (Br. at 16). Notably, however, DOE has not submitted any declarations or other admissible evidence detailing the causes for the delay. The Act vests DOE with substantial discretion regarding the rule's substance, it is true. *See, e.g.*, 42 U.S.C. § 13257(a)(2), (g)(2). Yet endless delay does not serve the Act's purposes. This order finds it significant that DOE has now missed two sets of deadlines—the statutory deadlines, and the ones it set for itself. It is also significant that Congress plainly intended that *some* form of final determination subject to review be made not later than April 1, 2000—more than two years ago. 42 U.S.C. § 13257(f)(2), (h).

On the other hand, the Act's purposes would not be furthered by a hastily-issued and uninformed timetable, or an injunction vaguely ordering the Secretary to "promptly" or "expeditiously" pursue its rulemaking efforts. Such a course would promise only further hearings, further delay, and needless consumption of all parties' resources. The parties are therefore **ORDERED** to simultaneously submit, not later than **August 29, 2002,** proposed timetables for DOE compliance with the Act's private and local fleet rulemaking process. The parties shall submit simultaneous reply briefs not later than **September 12, 2002.** The parties shall submit along with their initial timetables any and all declarations or other supporting evidence they consider relevant to their timetable. On **September 26, 2002,** a further hearing will be held concerning the proper timetable going forward.

## CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment is **DENIED** in all respects. Plaintiffs' motion for partial summary judgment as to Count I is **GRANTED.** Their request for declaratory relief on this count is **GRANTED;** their request for injunctive relief is **DENIED.** Plaintiffs' motion for summary judgment as to Count II is **GRANTED,** with injunctive and declaratory relief as discussed above. Plaintiffs' motion for summary judgment as to Count III is **GRANTED,** with declaratory relief issued and the proper injunctive relief to be determined after follow-up briefing.

**IT IS SO ORDERED.**